[No. A039020. First Dist., Div. Four. Nov. 29, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
GUY THOMAS STRINGHAM, Defendant and Appellant.

[Opinion certified for partial publication.*]

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part III.

COUNSEL

Corinne S. Shulman, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Martin S. Kaye and Laurence K. Sullivan, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

POCHÉ, Acting P. J.—Defendant Guy Thomas Stringham appeals from a judgment of conviction entered after a jury returned verdicts finding him guilty of second degree murder, kidnapping, and felony false imprisonment (Pen. Code, §§ 187, 207, 236).[1] The primary question presented is this: Can a plea bargain which has been accepted by one judge be rejected by another judge following the commencement of sentencing proceedings at which a murder victim's next of kin appears and denounces the negotiated disposition? Our answer is Yes.

PROCEDURE AND EVIDENCE

The centerpiece of the amended information filed against defendant was the charge that he had murdered Paul Snipes. This count included special circumstance allegations that the murder had occurred while defendant was engaged in kidnapping Snipes, and that the murder involved the infliction of torture (§ 190.2, subds. (a)(17)(ii), (a)(18)). The murder count also included allegations that defendant had been armed with a firearm (§ 12022, subd. (a)), and that he had furnished a firearm "to another for the purpose of aiding, abetting and enabling that person to commit a felony" within the meaning of section 12022.4.

Defendant was further charged with additional crimes against Snipes, specifically; two counts of assault with a deadly weapon or by means of

---

[1] Statutory references are to the Penal Code unless otherwise indicated.

force likely to produce great bodily injury (§ 245, subd. (a)(1)); kidnapping; false imprisonment effected by violence, menace, fraud, and deceit; and separate counts of conspiring to kidnap Snipes and to falsely imprison him (§ 182). All of the offenses alleged in the information occurred on or about August 21, 1986.

On December 12, 1986, the prosecutor informed Judge Petersen that "we have reached a resolution in this case." The terms of the agreement were that the prosecutor would amend the murder charge to voluntary manslaughter. Defendant would enter pleas of guilty to voluntary manslaughter and kidnapping. In addition, defendant would admit the allegation that he had furnished a firearm to another. The remaining charges and enhancement allegations would be dismissed. In conformity with section 1192.7, and in response to a question from Judge Petersen, the prosecutor stated that the basis for concurrence to the plea was his uncertainty whether he could produce the testimony of a pair of material witnesses.[2] Judge Petersen advised defendant that "acceptance [of the proposed disposition], of course, is conditional and if, after I read the probation report, . . . I desire to not accept the plea, it will be so stated and you will be allowed to . . . withdraw your guilty plea and the matter will then go to trial on all the charges now pending against you. . . . [¶] . . . [U]pon the Court's acceptance, if I do accept this negotiated plea, the other charges will be dismissed against you." After being admonished of the rights he would be surrendering, defendant entered guilty pleas in accordance with the terms of the negotiated disposition. January 23, 1987, was the date set for receipt of a probation report[3] and for sentencing.

On December 18, 1986, Judge Petersen told the parties that he was recusing himself and requesting that "the Judicial Council . . . assign an outside Judge to handle all future proceedings in this case."[4] Judge Petersen

---

[2] One of the witnesses was Detective Richard Williams, who had conducted an interrogation of defendant, and who had subsequently suffered a heart attack. The other was Mitchell Farrell, who was involved in events surrounding Snipes's death. As will be seen, Williams eventually testified at defendant's trial. Farrell refused to testify and was adjudged in contempt.

[3] Due to the fact that defendant's mother was employed by the probation department of Del Norte County (see fn. 4, *post*), it was agreed that the probation report would be prepared by the probation department of either Humboldt or Siskiyou County.

[4] Judge Petersen's apparently sua sponte "Notification Of Recusal" read in pertinent part: "[T]his Judge recuses himself because a member of the victims' [*sic*: victim's] family has made allegations that one of the reasons the negotiated plea was entered into is because a member of the Defendant's family is employed in the Probation Department. It is my opinion that if this Judge accepts the plea and/or imposes a sentence less than the maximum, they will conclude it is showing favoritism. Therefore this Judge is requesting the Judicial Council to assign an outside Judge to handle all future proceedings in this case."

was thereafter replaced by Judge Buffington from Humboldt County. The following events occurred in 1987: When proceedings were resumed before Judge Buffington on January 23d, he stated that he had received and read the probation report. He then inquired "Is there any legal cause why sentence should not be pronounced?" After responding "No legal cause," defendant's counsel addressed himself to an appropriate sentence in light of the probation report. During the course of his presentation counsel's remarks apparently became too factually specific for the court, which interrupted: "I've read the probation report. I've read the mitigation [statement], but what I need to do is read [more about] this [case]. You're going to be splitting hairs over whether or not one of the facts or another fact applies, and I can't make any judgment without really reading the preliminary examination. That's going to take some period of time. . . . [¶] Tell me what you want me to consider and tell how long you think it's going to take. I think it's unfair to the People, I think it's unfair to the defendant, I think it's unfair to Mr. Snipes' family, and certainly unfair to me, to expect me to do a just sentencing on no knowledge of what's happened."

After determining that Snipes's parents were present, Judge Buffington inquired of them "I take it that you and your family are saying that I should not accept this plea?" Mr. Snipes answered affirmatively, and said that he had been told by a probation officer "I had the right to make a statement here." Replying that "You will have a right," Judge Buffington was asked by Mr. Snipes if "the decision is to be made today whether to accept this plea today or not. Is that correct so far?" Judge Buffington responded "Yes, sir, basically," and then permitted Mr. Snipes to read a statement in which Mr. Snipes passionately excoriated the plea bargain and the "remiss attitude on the part of the prosecution." Mr. Snipes concluded his statement with these remarks: "When you consider the lack of punishment already mentioned[5] and the apparent lack of professionalism on the part of the prosecution, I hope you'll agree that justice has not been served in this case and deal with these to reverse that trend. Guy Stringham is a murderer and should be charged accordingly." Judge Buffington gave Mr. Snipes permission to "write a letter to the Court" with any additional comments. "I'll consider the letter. I'll consider your comments in making the decision that I have to

---

It also appears that defendant's sister and brother-in-law are employed by local law enforcement agencies.

[5] Mr. Snipes had earlier mentioned that others involved in the death of his son (i.e., Farrell, James Balfour, and Cheryl Horn) had either had all charges dropped or had been allowed to plead guilty to significantly reduced charges. At the time of trial, Farrell was in state prison after pleading guilty to first degree murder, and Balfour had pleaded guilty to assault with a deadly weapon and was awaiting sentencing.

Mr. Snipes's low opinion of the district attorney's office was no passing fancy. He subsequently sought without success to have the district attorney's office disqualified and replaced by the Attorney General.

make." After conferring with counsel for both sides regarding the materials he could examine to familiarize himself with the case, Judge Buffington continued matters until January 30th.

On January 30th the court conducted a hearing at which the parties earnestly requested acceptance of the plea bargain. The prosecutor outlined several perceived obstacles to convicting defendant for murder, one of the difficulties being the likely unavailability of Detective Williams. (See fn. 2 and accompanying text, *ante.*) Judge Buffington, however, was unsatisfied that Williams could not be produced, and his review of the preliminary examination transcript and the other materials designated by the parties for his perusal persuaded him that "there's a case to be tried here." He therefore rejected the bargain and set a March trial date.

The evidence received at the trial need not be summarized in exhaustive detail because defendant does not make any claim that it is insufficient to support his convictions. The pertinent circumstances shown by the trial record can be reduced to the following: The victim, Paul Snipes, went to Cheryl Horn's house trailer on the evening of August 21, 1986, in response to a telephone request from Ms. Horn. While Ms. Horn was awaiting Paul's arrival, Mitch Farrell came to her house and told her that he wanted to talk to Paul. When Paul entered the house, Farrell hit and kicked him, before and after he tied Paul's hands behind his back. The two men left at approximately 10:30 p.m. When they returned about an hour later, Paul displayed signs of additional beatings. In Ms. Horn's words, "he was messed up, you couldn't tell it was the same person when he left." Farrell continued to beat and kick Paul. James Balfour came to the trailer shortly thereafter.

According to Ms. Horn, Farrell and Balfour were looking for defendant. Balfour telephoned defendant, who came to the trailer. Before the four men departed at about 2 a.m., Paul had "his fingers bent back" by Farrell, who also brandished a knife (brought by defendant) and "threatened to cut his balls off." The beating and kicking continued, mostly by Farrell, but defendant did kick Paul at least once. Defendant, Farrell, and Balfour called Paul names ("punk," "liar," "thief") and Farrell accused him of causing the death of a friend; defendant in particular "wanted to know about who ripped him off." After Farrell stated "We're going to go take him and finish him off," defendant replied "Not so loud, he might hear you." Paul asked the others " 'Just quit beating me. . . . Just go finish me off.' " After the four men left the trailer, Farrell returned approximately 20 minutes later. The following day Farrell told Ms. Horn that he had shot Paul.

Richard Williams, previously employed as a detective with the Del Norte County Sheriff's Department, testified that he interviewed defendant

concerning the Snipes homicide on September 4, 1986. Defendant recounted that "he got . . . wound up with everything that was going on and he got himself involved, that he did kick Mr. Snipes, he did threaten Mr. Snipes with the knife," and he did talk about shooting Paul. Upon leaving Ms. Horn's trailer, defendant, Farrell, and Balfour drove Paul away with the aim of "thumping him further." Defendant had a shotgun, which he gave to Farrell, knowing it was about 80 percent sure that Farrell would use it to kill Paul.

Detective Williams further testified that Paul's body was discovered in the culvert of a freeway embankment. The physician who performed the autopsy on the body testified that he observed extensive "blunt trauma" about the head and chest, and a shotgun wound to the neck which was the cause of death.

Defendant testified that he went to Ms. Horn's trailer to see if Paul could assist him in finding a man named Larry Moriarity. He knew Balfour only vaguely, and did not know Farrell or Ms. Horn at all. Defendant admitted that, before leaving the trailer, he did kick Paul once; that it was his knife with which Farrell threatened Paul; and that, brandishing a shotgun shell, he (defendant) did tell Paul "If I was going to kill you, I would start with your foot and work my way up" even though "I was just blowing off steam." Once they left the trailer, Paul, who had apparently agreed to help locate Moriarity, was put in defendant's truck and driven away with defendant and Farrell. Defendant thought "we were heading out to the Redwood Motel where Larry Moriarity was supposed to be." Before they reached this destination,[6] Farrell had the truck stopped along a heavily wooded section of the freeway because "he'd talk to him [Paul] some more." Defendant thought Farrell asked " 'Let me see the gun,' because he wanted to use it to get at the truth at Paul." Farrell and Paul went "down the hill," following which defendant heard a gunshot. He saw Farrell striking Paul (who was "making some kind of noise") with the butt of the shotgun. Thinking "Get rid of the evidence," defendant collected the shotgun and looked for an ejected shotgun shell while Farrell dragged the body to the culvert. Defendant and Farrell then returned to the truck and left the scene. Defendant testified that his statement to Detective Williams was truthful but not entirely accurate, primarily in that he had no inkling

---

[6] During the course of the statement he made when interrogated by Detective Williams defendant stated that he did in fact drive to the motel and "parked out in the field across from where Larry Moriarity was staying." After defendant and Farrell tried "to figure out how they were going to get Moriarity out" of the motel, "then it was decided by Mitch that they would go ahead and go up into the woods, question Paul Snipes a little further, tie him up, and then come back and get Moriarity, and then take Moriarity to where Snipes was and talk to the both of them."

Farrell was going to use defendant's shotgun to kill Paul; the "eighty percent hunch" he mentioned to Williams was "using a lot of hindsight."

The jury found defendant guilty of second degree murder ("Killing Resulting from an unlawful Act dangerous to life"),[7] kidnapping, and false imprisonment, as well as finding true the allegation that he had furnished a firearm "to another with the purpose of aiding or abetting a felony." Defendant was acquitted of the assault charges. The conspiracy charges were apparently dismissed on the prosecutor's motion before the case was submitted to the jury.

Defendant was sentenced as follows: eight years for the kidnapping; three years for the false imprisonment, this term permanently stayed pursuant to section 654 upon completion of the kidnapping term; a term of fifteen years to life for the murder, this term to commence upon completion of the kidnapping term; and an additional two years for the firearm enhancement, this term also being permanently stayed pursuant to section 654 upon completion of the murder term. This timely appeal followed.

REVIEW

I

Defendant presents a variety of arguments in support of his contention that the plea bargain proposed to Judge Petersen should be specifically enforced because it was erroneously rejected by Judge Buffington. We discuss each separately.

(A)

Defendant initially contends that the bargain must be specifically enforced because it was in fact accepted by Judge Buffington. Defendant submits that the court's authority to reject the plea lapsed and the court could only proceed to pronounce judgment as required by section 1202 after the court had (1) performed the allocution required by section 1200, (2) ascertained that defendant had no legal cause why judgment should not be pronounced, and (3) permitted Mr. Snipes to speak as a matter of right pursuant to section 1191.1. Defendant is in effect arguing that compliance with sections 1200 and 1191.1 marks the point of no return for a court's power to withdraw approval of a plea bargain.

---

[7] This language appears on the verdict form. The verdict forms completed by the jury leave no doubt as to the precise basis for their decision on the homicide charge, conclusively demonstrating their conclusions that defendant was not guilty of "premeditated and deliberate" first degree murder, and not guilty of either first or second degree felony murder.

■ We start with the basic proposition that "[j]udicial approval is an essential condition precedent to any plea bargain worked out by the defense and the prosecution." (*People* v. *Cardoza* (1984) 161 Cal.App.3d 40, 45 [207 Cal.Rptr. 388].) The parties' negotiated disposition is ineffective unless and until it is approved by the court. (See *People* v. *Orin* (1975) 13 Cal.3d 937, 942-943 [120 Cal.Rptr. 65, 533 P.2d 193].) This principle is recognized in numerous statutes (e.g., §§ 1192.1, 1192.2, 1192.4), the most important of which is section 1192.5.[8]

The court's approval of a proposed plea bargain must necessarily be an informed decision. The court can be expected to consult the probation report that will almost always be prepared. (See §§ 1191, 1203, subds. (b), (g); Cal. Rules of Court, rule 418; *People* v. *Kaanehe* (1977) 19 Cal.3d 1, 14 [136 Cal.Rptr. 409, 559 P.2d 1028].) In felony cases, the court may (as did Judge Buffington) examine the transcript of the defendant's preliminary examination. Diagnostic reports received pursuant to section 1203.03, statements in aggravation and mitigation, and victim statements (see § 1170, subd. (b)) may also be considered. Information from these and other sources is available to a court pondering whether to withdraw its approval of a negotiated disposition. It cannot be assumed that no attention will be paid to them by the court. The potential for reflection and a change of the judicial position is obvious and statutorily sanctioned. "[I]mplicit in the language of section 1192.5 is the premise that the court, upon sentencing, has broad discretion to withdraw its prior approval of a negotiated plea." (*People* v. *Johnson* (1974) 10 Cal.3d 868, 873 [112 Cal.Rptr. 556, 519 P.2d 604].) That statute "provides that the court's approval of a plea bargain is not binding on the court and that approval may be withdrawn at the time of sentencing if the court, after further consideration and in the exercise of its inherent discretion in sentencing, concludes that the bargain is not in the best interests of society" (*People* v. *Woodard* (1982) 131 Cal.App.3d 107, 110 [182 Cal.Rptr. 254]) or "upon [the court] being more fully informed about the case." (*People* v. *King* (1981) 123 Cal.App.3d 406, 408 [176 Cal.Rptr. 507]; see *People* v. *Beasley* (1970) 5 Cal.App.3d 617, 624, fn. 3 [85 Cal.Rptr. 501].) A change of the court's mind is thus always a possibility.

---

[8] Section 1192.5 provides in pertinent part: "Where such plea [of guilty] is accepted by the prosecuting attorney in open court and is approved by the court, the defendant, except as otherwise provided in this section, cannot be sentenced on such plea to a punishment more severe than that specified in the plea and the court may not proceed as to such plea other than as specified in the plea.

"If the court approves of the plea, it shall inform the defendant prior to the making of the plea that (1) its approval is not binding, (2) it may, at the time set for the hearing on the application for probation or pronouncement of judgment, withdraw its approval in the light of further consideration of the matter, and (3) in such case, the defendant shall be permitted to withdraw his plea if he desires to do so. . . .

"If such plea is not accepted by the prosecuting attorney and approved by the court, the plea shall be deemed withdrawn . . . ."

With respect to the proposed disposition, defendant was expressly told by Judge Petersen that the court's "acceptance, of course, is conditional." Judge Buffington's comments at his first appearance in the case clearly advised defendant that acceptance was still conditional and had not yet become irrevocable. █ ██ The fact that Judge Buffington's final decision occurred after he performed the allocution required by section 1200[9] is not controlling. With the possible exception of capital cases (see *People* v. *Robbins, supra,* 45 Cal.3d 867 at pp. 888-890; *id.* at p. 891 (conc. opn. of Mosk, J.)), allocution remains what this court termed it in 1971, "a formality only." (*People* v. *Chew* (1971) 16 Cal.App.3d 254, 258 [94 Cal.Rptr. 83].) Nothing in the plain language of section 1200 suggests that it restricts the court's near-plenary power granted by section 1192.5 to retract approval of a plea bargain. As a matter of practical reality, allocution may often commence the hearing at which judicial doubts about the negotiated disposition ripen into a resolve to reject it. It would be at such a hearing that the court is advised of any second thoughts by the parties. Moreover, assuming the prosecution remains inclined to abide by its prior consent and a specific sentence choice is not an integral component of the bargain, the parties' views of the appropriate sentence choice in light of the probation report will be expressed at the sentencing hearing. That marks a logical and appropriate point for the court, "upon being more fully informed about the case" (*People* v. *King, supra,* 123 Cal.App.3d 406 at p. 408), to "conclude[ ] that the bargain is not in the best interests of society." (*People* v. *Woodard, supra,* 131 Cal.App.3d 107 at p. 110.)

 It is also at the sentencing hearing that the victim or the victim's next of kin may appear pursuant to section 1191.1.[10] That statute was

---

[9] Section 1200 provides: "When the defendant appears for judgment he must be informed by the Court, or by the Clerk, under its direction, of the nature of the charge against him and of his plea, and the verdict, if any thereon, and must be asked whether he has any legal cause to show why judgment should not be pronounced against him."

"Allocution is defined as the 'Formality of a court's inquiry of prisoner as to whether he has any legal cause to show why judgment should not be pronounced against him on verdict of conviction.' (Black's Law Dict. (5th ed. 1983) p. 39.)" (*People* v. *Robbins* (1988) 45 Cal.3d 867, 891 [248 Cal.Rptr. 172, 755 P.2d 355] (conc. opn. of Mosk, J.); accord *People* v. *Cross* (1963) 213 Cal.App.2d 678, 681 [28 Cal.Rptr. 918].)

[10] Section 1191.1 provides in pertinent part: "The victim of any crime, or his or her parent or guardian if the victim is a minor, or the next of kin of the victim if the victim has died, has the right to attend all sentencing proceedings . . . and shall be given adequate notice by the probation officer of all sentencing proceedings concerning the person who committed the crime.

"The victim, or his or her parent or guardian if the victim is a minor, or next of kin has the right to appear, personally or by counsel, at the sentencing proceeding and to reasonably express his or her views concerning the crime, the person responsible, and the need for restitution. The court in imposing sentence shall consider the statements of victims, parents, or guardians, and next of kin made pursuant to this section and shall state on the record its conclusion concerning whether the person would pose a threat to public safety if granted probation. . . ."

enacted as part of an initiative measure entitled "The Victim's Bill of Rights," the general goal of which was to promote the rights of victims of crime. (See *Brosnahan* v. *Brown* (1982) 32 Cal.3d 236, 247 [186 Cal.Rptr. 30, 651 P.2d 274]; *People* v. *Zikorus* (1983) 150 Cal.App.3d 324, 330 [197 Cal.Rptr. 509].) The specific goal of section 1191.1 "was to mandate a previously optional procedure; to *require* the judge to listen to and consider the views of the victim." (*People* v. *Zikorus, supra* at p. 331 [original italics].) As with section 1200, nothing in the plain language of section 1191.1 hints at any limitation of the court's power to reject a plea bargain pursuant to section 1192.5. To the contrary, section 1191.1 expressly entitles the victim or next of kin to appear and address the court at "all sentencing proceedings." Numerous authorities have construed section 1192.5 as authorizing withdrawal of approval of a plea bargain well after the start of proceedings accompanying sentencing. (See e.g., *People* v. *Johnson, supra,* 10 Cal.3d 868 at p. 873 [court can withdraw approval "upon sentencing"]; *In re Falco* (1986) 176 Cal.App.3d 1161, 1165 [222 Cal.Rptr. 648] [withdrawal proper "at the time of sentencing"]; *In re Eads* (1980) 102 Cal.App.3d 499, 503 [162 Cal.Rptr. 411] ["the trial court is . . . authorized to withdraw its prior approval . . . at the time set for pronouncement of judgment"].)

If, as occurred here, a defendant obviates the necessity of a trial by entering a plea of guilty, matters will proceed directly to the sentencing hearing. If the victim or next of kin is dissatisfied with the plea and wishes to protest, the earliest opportunity to do so will be at that hearing. The sentencing hearing will commence with the court making the inquiry demanded by section 1200. Having no inkling of the victim's or next of kin's disgruntlement, the defendant will answer that there is no legal cause why judgment should not be pronounced. Only thereafter will the victim or next of kin have an opportunity to make the statement expressly authorized by section 1191.1. To accept defendant's argument that the court is at that point divested of its power to reject the plea bargain would consign the statement to utter ineffectuality: the court would have to listen to the statement and then ignore it, powerless to do anything based upon the statement protesting such a *fait accompli*. This situation might only be aggravated if the bargain included a specified sentence, for then the victim or next of kin would not even have the satisfaction of arguing for a more severe punishment.

The clear purposes behind section 1191.1 are to acquaint the court with the victim's unique perspective of the case, and require consideration of the victim's statement by the court. Our obligation in construing section 1191.1 is to adopt a construction of section 1191.1 that will effectuate the voters' intent, give meaning to each word and phrase, and avoid absurd results.

(See *People* v. *Woodhead* (1987) 43 Cal.3d 1002, 1010 [239 Cal.Rptr. 656, 741 P.2d 154]; *People* v. *Aston* (1985) 39 Cal.3d 481, 492 [216 Cal.Rptr. 771, 703 P.2d 111]; *People* v. *Zikorus, supra,* 150 Cal.App.3d 324 at pp. 329-330.) It would be difficult to conceive of a more absurd result than to adopt a construction which would prevent a victim or next of kin from having a meaningful opportunity to protest a plea bargain that will allow a defendant to escape the punishment which the victim or next of kin feels is appropriate to the crime. Defendant's construction would reduce the victim's statement to "an arid ritual of meaningless form." (*Staub* v. *City of Baxley* (1958) 355 U.S. 313, 320 [2 L.Ed.2d 302, 310, 78 S.Ct. 277].) Fidelity to our obligation in construing section 1191.1 compels us to reject defendant's interpretation and thereby preserve a provision of "The Victim's Bill of Rights" from becoming a dead letter in the significant context of negotiated dispositions. Defendant's initial attack on Judge Buffington's withdrawal of judicial sanction of the plea bargain fails accordingly.

## (B)

Defendant next assails Mr. Snipes's right to make his statement and the propriety of the substance of his statement.

■ Defendant presents an elaborate argument concerning Mr. Snipes's supposed lack of standing to address the court. That argument may be recast as follows: Sections 1191.1 and 679.02[11] entitle victims and other designated persons to appear at "all sentencing proceedings" and "express . . . views concerning the crime, the person responsible, and the need for restitution." Doubling back on his first argument, defendant now sees the fact that the plea bargain had not become final as establishing that matters had not proceeded to the sentencing stage where Mr. Snipes would be entitled to be heard.

The hearing Judge Buffington convened on January 23, 1987, was a "sentencing proceeding" within the meaning of sections 679.02 and 1191.1. His compliance with section 1200 leaves no room for doubt on that point. In assuming that a "sentencing proceeding" involves nothing more than the arraignment for judgment and the pronouncement of sentence, however, defendant gives too narrow a reading to the term. A sentencing proceeding is a concept of considerable flexibility, with much richness of diversity. It

---

[11] Section 679.02, subdivision (a)(3) provides: "The following are hereby established as the statutory rights of victims and witnesses of crimes: [¶] For the victim, the victim's parents or guardian if the victim is a minor, or the next of kin of the victim if the victim has died, to be notified of all sentencing proceedings, and of the right to appear, to reasonably express his or her views, and to have the court consider his or her statements, as provided by Section 1191.1."

may encompass motions for a new trial (see §§ 1181, 1201, subd. (b)), motions in arrest of judgment (see § 1185), and attacks on a plea of guilty (see § 1018; *People* v. *Griggs* (1941) 17 Cal.2d 621, 624 [110 P.2d 1031]; *People* v. *Grand* (1971) 16 Cal.App.3d 27, 30-31 [93 Cal.Rptr. 658]). Doubts as to the defendant's sanity may be raised and resolved. (See §§ 1201, subd. (a), 1203.03, 1368.) Charges, enhancements, and special circumstance findings may be stricken. (See § 1385; *People* v. *Williams* (1981) 30 Cal.3d 470, 477-490 [179 Cal.Rptr. 443, 637 P.2d 1029].) Supplemental probation reports may be ordered. (See *People* v. *Grimble* (1987) 196 Cal.App.3d 1058, 1062-1064 [242 Cal.Rptr. 382].) A "sentencing proceeding" has even been held to include matters such as the termination of a restitution order which follows the actual imposition of sentence. (See *Melissa J.* v. *Superior Court* (1987) 190 Cal.App.3d 476, 478 [237 Cal.Rptr. 5].)

Judicial deference to statutory language is not synonymous with slavishness to literalism. Linguistic defects both patent and latent in initiative statutes have on numerous occasions been subordinated to manifest voter intent. (See e.g., *People* v. *Skinner* (1985) 39 Cal.3d 765, 775-777 [217 Cal.Rptr. 685, 704 P.2d 752]; *People* v. *Bigelow* (1984) 37 Cal.3d 731, 755 [209 Cal.Rptr. 328, 691 P.2d 994, 64 A.L.R.4th 723]; *Lynch* v. *State Bd. of Equalization* (1985) 164 Cal.App.3d 94, 114-115 [210 Cal.Rptr. 335]; *Cooperrider* v. *Civil Service Com.* (1979) 97 Cal.App.3d 495, 500-503 [158 Cal.Rptr. 801]; *Sanders* v. *Pacific Gas & Elec. Co.* (1975) 53 Cal.App.3d 661, 670-678 [126 Cal.Rptr. 415].) The withdrawal of approval of a plea bargain may not ordinarily and literally be seen as comprehended within a "sentencing proceeding." Nevertheless, as shown in part I(A), final action regarding a negotiated disposition may occur during the course of a sentencing proceeding. The manifest purpose of the electorate in enacting section 1191.1 would be frustrated if victims or next of kin were deprived of the opportunity to acquaint the court with their opinion concerning the propriety of a plea bargain. The obvious occasion for such opinions to be expressed is at the "sentencing proceedings" that will in the normal course of affairs follow close on the heels of an accepted plea bargain. We therefore hold that sections 1191.1 and 679.02 entitle a victim or next of kin to attack a plea bargain at a "sentencing proceeding"—i.e., "when the case comes on for sentencing after the plea has been formally approved and entered." (*People* v. *Townsend* (1985) 171 Cal.App.3d 900, 903 [215 Cal.Rptr. 120].) In light of this conclusion, Mr. Snipes's "right" to make the statement was correctly recognized by Judge Buffington. Defendant's claim that Mr. Snipes lacked standing to make his statement to Judge Buffington must consequently be rejected.

Defendant's attack on the substance of Mr. Snipes's remarks is also unavailing. In enacting section 1191.1 the people, the supreme and

sovereign source of power in this state (see Cal. Const., art. II, § 1), gave Mr. Snipes the right "to reasonably express his . . . views concerning the crime, the person responsible, and the need for restitution." Mr. Snipes was not concerned with restitution, but he did have strong views regarding the crime and defendant's responsibility. The victim was not idealized ("He became addicted to drugs and did resort to thievery to support his addiction"), and in any event a murdered person's parent can hardly be expected to maintain an angelic impartiality. Mr. Snipes's remarks, which did not elicit a single objection from either the defense or the prosecution, were not hasty or ill-considered. He had followed the case closely and taken the trouble to write out his statement, which he read to Judge Buffington. Strictly speaking, his comments concerning the "apparent lack of professionalism on the part of the prosecution" may not have been germane when viewed in isolation. But seen in the context of Mr. Snipes's entire statement, that opinion was connected to the larger issues of whether "the person responsible" would face punishment appropriate to "the crime." His bottom-line conclusion ("Guy Stringham is a murderer and should be charged accordingly") dealt directly with defendant's responsibility and culpability for the crimes charged. It was therefore fully harmonious with section 1191.1. Following his own independent examination, Judge Buffington agreed with that conclusion. More importantly, so did the jury.

*Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529] does not constitute a basis for invalidating Mr. Snipes's statement. The court in *Booth,* taking pains to limit its holding to capital cases, held that introduction of a "Victim Impact Statement" at the sentencing phase of a capital murder trial violated the Eighth Amendment because it "can serve no other purpose than to inflame the jury and divert it from deciding the case on the relevant evidence concerning the crime and the defendant." (*Id.* at pp. 508-509 [text & fn. 12] [96 L.Ed.2d 440 at p. 452, 107 S.Ct. 2529 at p. 2536].) Mr. Snipes was not addressing the finder of fact at the sentencing phase of a capital trial.

### (C)

Defendant's next ground for attacking Judge Buffington's decision to reject the plea bargain is that "[t]he court did not properly exercise its discretion" in doing so. As previously mentioned, section 1192.5 impliedly vests a court with "broad discretion to withdraw its prior approval of a negotiated plea." (*People* v. *Johnson, supra,* 10 Cal.3d 868 at p. 873.) "Judicial discretion is that power of decision exercised to the necessary end of awarding justice based upon reason and law but for which decision there is no special governing statute or rule. Discretion implies that in the absence of positive law or fixed rule the judge is to decide a question by his

view of expediency or of the demand of equity and justice. . . . The term implies absence of arbitrary determination, capricious disposition or whimsical thinking. It imports the exercise of discriminating judgment within the bounds of reason. Discretion in this connection means a sound judicial discretion enlightened by intelligence and learning, controlled by sound principles of law, of firm courage combined with the calmness of a cool mind, free from partiality, not swayed by sympathy or warped by prejudice or moved by any kind of influence save alone the overwhelming passion to do that which is just." (*People v. Surplice* (1962) 203 Cal.App.2d 784, 791 [21 Cal.Rptr. 826]; accord *Harris* v. *Superior Court* (1977) 19 Cal.3d 786, 796 [140 Cal.Rptr. 318, 567 P.2d 750]; *People v. Preyer* (1985) 164 Cal.App.3d 568, 573 [210 Cal.Rptr. 807]; *People v. Hernandez* (1984) 160 Cal.App.3d 725, 750 [206 Cal.Rptr. 843].) Measured against virtually every aspect of this standard, Judge Buffington is immune from the charge of abuse.

 Judge Buffington did not withdraw approval of the plea bargain until after he had ordered a one-week continuance on his own motion to study the case. That time was put to good use: his comments a week later establish a deep knowledge of the case that could only have come from mastering the preliminary examination transcript and the other sources requested by the parties. Not content with just acquainting himself with the circumstances of the crimes, Judge Buffington also reexamined the apparent basis for Judge Petersen's prior acceptance of the plea bargain. After putting a series of searching questions to the prosecutor, Judge Buffington elicited that no real effort had been made to ensure Detective Williams's presence at trial. That in turn impeached the prosecutor's representation that he could not prove murder, a conclusion with which Judge Buffington expressly disagreed. It is almost certain that Judge Buffington thus believed the prosecutor's consent to the bargain was based upon factually misplaced impressions concerning these points (cf. *People v. Cobb* (1983) 139 Cal.App.3d 578, 582, 586 [188 Cal.Rptr. 712]) and legally dubious authority to negotiate the bargain.[12] The week-long hiatus would also have allowed Judge Buffington to place Mr. Snipes's statement in its proper perspective, with all influences of passion and sympathy disregarded. Judge Buffington's considered opinion was that "the bargain [was] not in the best interests of society." (*People v. Woodard, supra,* 131 Cal.App.3d 107 at p. 110.) In light

---

[12] Section 1192.7, subdivision (a), which was adopted by the voters at the same time as section 1191.1, provides in pertinent part: "Plea bargaining in any case in which the indictment or information charges any serious felony . . . is prohibited, unless there is insufficient evidence to prove the people's case, or testimony of a material witness cannot be obtained, or a reduction or dismissal would not result in a substantial change in sentence."

The murder and kidnapping charges against defendant each qualified as a "serious felony" for purposes of this statute. (§ 1192.7, subds. (c)(1) and (c)(20).)

of the preceding discussion, there is no tincture of the abused discretion defendant claims.

## (D)

■ The final prong of defendant's attack is that the "extraneous considerations" and "overbearing pressure" from the Snipes family so effected Judge Buffington's objectivity as to amount to a violation of due process which can only be remedied by specific performance, i.e., an order directing that defendant be sentenced in accord with the plea bargain. We find defendant's analysis inaccurate and his remedy inappropriate.

Defendant treats Mr. Snipes's statement as possessing a sufficient intrinsic prejudicial force that it irretrievably warped Judge Buffington's judgment. Contrary to defendant's position, Mr. Snipes's statement is not analogous to coercive forces on the order of a lynch mob (see *Frank* v. *Mangum* (1915) 237 U.S. 309, 335 [59 L.Ed. 969, 983, 35 S.Ct. 582]; *People* v. *Reid* (1924) 195 Cal. 249, 259 [232 P. 457, 36 A.L.R. 1435]; cf. *People* v. *Fleming* (1913) 166 Cal. 357, 371-377 [136 P. 291]) or pervasive extrajudicial publicity. (See *Sheppard* v. *Maxwell* (1966) 384 U.S. 333, 352-357 [16 L.Ed.2d 600, 614-617, 86 S.Ct. 1507]; *Rideau* v. *Louisiana* (1963) 373 U.S. 723, 724-727 [10 L.Ed.2d 663, 664-666, 83 S.Ct. 1417]; cf. *Estes* v. *Texas* (1965) 381 U.S. 532, 543-550 [14 L.Ed.2d 543, 550-554, 85 S.Ct. 1628].) It has already been established that the statement made by Mr. Snipes enjoyed statutory sanction, and that the substance of his remarks was, in general, comfortably within the scope permitted by section 1191.1. Mr. Snipes was certainly more than a casual observer (see fn. 5 and accompanying text, *ante*), but he cannot be found guilty of exerting "overbearing pressure" on the court. Judge Buffington's decision to withdraw approval of the plea was informed and deliberate. The stated grounds had nothing to do with either Mr. Snipes or his statement, but only the absence of the defects the prosecutor perceived in sustaining the murder charge against defendant. Nothing in defendant's briefs or the record rebuts the presumption that Judge Buffington acted solely on the basis of proper motives and considerations. (See Evid. Code, § 664; *Ross* v. *Superior Court* (1977) 19 Cal.3d 899, 913 [141 Cal.Rptr. 133, 569 P.2d 727].)

"Specific enforcement of a particular agreed upon disposition must be strictly limited because it is not intended that a defendant and prosecutor be able to bind a trial court" (*People* v. *Kaanehe, supra,* 19 Cal.3d 1 at p. 14) "which remains free, even after initial approval, to finally reject it." (*People* v. *Daugherty* (1981) 123 Cal.App.3d 314, 322 [176 Cal.Rptr. 500].) Defendant was explicitly warned by Judge Petersen that the plea bargain could still be rejected. Up to the point when it was rejected by Judge Buffington, the

negotiated disposition was not something to which defendant had an immutably vested interest superior to all judicial interference. Accordingly, this was not one of the "very special circumstances" (*People* v. *Kaanehe, supra,* at p. 13) where specific enforcement would be appropriate.

## II

As previously mentioned, defendant was sentenced to separate terms of imprisonment for the kidnapping and the murder. He contends that the term for the kidnapping should have been stayed pursuant to section 654 because "the kidnapping was for a single criminal objective, the commission of additional bodily harm to the victim (which resulted in his death)."

"Section 654 does not preclude multiple convictions but only multiple punishments for a single act or indivisible course of conduct. [Citation.] 'The proscription against double punishment . . . is applicable where there is a course of conduct which violates more than one statute and comprises an indivisible transaction punishable under more than one statute . . . . The divisibility of a course of conduct depends upon the intent and objective of the actor, and if all the offenses are incident to one objective, the defendant may be punished for any one of them but not for more than one.' " (*People* v. *Miller* (1977) 18 Cal.3d 873, 885 [135 Cal.Rptr. 654, 558 P.2d 552].) " 'The initial inquiry in any section 654 application is to ascertain the defendant's objective and intent. If he entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' [Citation.] Whether the defendant maintained multiple criminal objectives is determined from all the circumstances and is primarily a question of fact for the trial court, whose finding will be upheld on appeal if there is any substantial evidence to support it." (*People* v. *Porter* (1987) 194 Cal.App.3d 34, 38 [239 Cal.Rptr. 269].) "However, when there is no dispute as to the facts, the applicability of Penal Code section 654 is a question of law." (*People* v. *Ratcliffe* (1981) 124 Cal.App.3d 808, 816 [177 Cal.Rptr. 627].)

Citing *People* v. *Milan* (1973) 9 Cal.3d 185 [107 Cal.Rptr. 68, 507 P.2d 956], defendant appears to argue that the undisputed evidence demonstrates as a matter of law that his sole criminal goal was to inflict additional bodily harm to Paul Snipes once the latter was taken from the trailer. The defendant in *Milan* was convicted (among other crimes) of the first degree murder of cab driver Burney, the robbery of Burney, and the kidnapping of Burney for the purpose of robbery with bodily harm. This is the passage

from *Milan* on which defendant relies: "Defendant may not be punished for both the kidnaping of Burney for the purpose of robbery with bodily harm and the murder of Burney which was the indivisible culmination of the infliction of bodily harm, . . ." (*Id*. at p. 196.) Defendant's reliance, and the argument he premises upon it, are misplaced.

*Milan* involved a conviction for violating section 209. (See *People* v. *Milan, supra,* 9 Cal.3d 185 at p. 192.) Defendant was convicted of violating section 207. Although both statutes deal with kidnapping, their emphasis and coverage differs. Section 207 is the general statute. Section 209 is aimed at kidnappings committed, not as the end of illegal endeavor, but rather as the subsidiary means of accomplishing another specified criminal intent. The ultimate criminal goals are different. Section 209 deals with situations with a substantial likelihood or actual occurrence of profound harm. The Supreme Court has held that the primary purpose behind section 209 is to impose harsher penalties for kidnappings whose commissions entail a substantially increased risk that the victim "will suffer grave bodily or psychic injury or even death." (*People* v. *Laursen* (1972) 8 Cal.3d 192, 198 [104 Cal.Rptr. 425, 501 P.2d 1145].) This may explain the practice of describing section 209 as covering "aggravated" kidnappings and section 207 as covering "simple kidnapings." (See *People* v. *Williams* (1970) 2 Cal.3d 894, 901 [88 Cal.Rptr. 208, 471 P.2d 1008].)

If the evidence conclusively showed that defendant participated in the kidnapping with, as he contends, the sole criminal objective of inflicting additional bodily harm, that would seem to bring him within the ambit of section 209. Yet it was section 207 which the prosecution accused him of violating. A possible objection is that this discloses nothing more than the prosecution's view of the case prior to production of all the evidence. Yet if the jury had believed the argument defendant now presents it almost certainly would have convicted him of first degree felony murder.[13] This we know it did not do. (See fn. 7 and accompanying text, *ante*.) The respect for the jury's conclusion displayed by Judge Buffington likewise precludes this court from determining that section 654 must operate as a matter of law in the manner defendant urges. (Cf. *People* v. *Green* (1980) 27 Cal.3d 1, 69-71 [164 Cal.Rptr. 1, 609 P.2d 468]; *In re Chapman* (1954) 43 Cal.2d 385, 389 [273 P.2d 817].)

---

[13] As construed by the Supreme Court in *People* v. *Bigelow, supra,* 37 Cal.3d 731 at page 755, section 190.2, subdivision (a)(17)(ii), which defendant was accused of violating, provides in pertinent part: "The penalty for a defendant found guilty of murder in the first degree shall be death or confinement in state prison for a term of life without the possibility of parole in any case in which one or more of the following special circumstances has been charged and specially found . . . to be true: [¶] The murder was committed *while the defendant was engaged in or was an accomplice in the commission of,* . . . [¶] *Kidnapping* in violation of Sections 207 [or] 209." (Italics added.)

This being so, the only remaining question is whether substantial evidence supports Judge Buffington's express findings that defendant had separate intents for the kidnapping and the murder. Those findings, made at the time of defendant's sentencing, were (with minor editorial changes made by us) as follows: "The Court finds the facts indicate the following: [¶] The defendant appeared at Mrs. Horn's trailer pursuant to a phone call from James Balfour. The defendant had been looking for Larry Moriarity or Mr. Snipes for some time.

"The defendant's testimony indicated that his sole interest in Mr. Snipes was to find Mr. Moriarity. The defendant wanted to find Moriarity because Moriarity had taken the defendant's money.

"The defendant testified that he did not intend to harm Snipes; he indicated that he wanted to leave to find Moriarity.

"When the defendant and Mr. Farrell and Mr. Snipes got to the location of Mr. Moriarity, they did not know how to lure Moriarity out of the motel. At this point the crimes of false imprisonment and kidnapping had been committed by the defendant with the stated goal of finding Moriarity.

"The defendant and the other two left the area of the motel and drove to Jedediah Smith State Park. The defendant handed a shotgun to Mr. Farrell; that act could not have furthered the intent to imprison or kidnap Mr. Snipes so as to get to Moriarity. The only possible conclusion is that the gun was provided to Mr. Farrell to enable Mr. Farrell to accomplish some separate criminal motive other than the kidnapping.

"Mr. Stringham knew that the chances were high, as he stated it, eighty percent, that the gun would be used to kill Snipes. The provision of the weapon was pursuant to an intent formed after the kidnapping, . . . These acts are, therefore, not incident to one objective and they may be separately punished."

Judge Buffington's logic is impeccable. If defendant was interested in kidnapping the victim only as a means to the end of getting to Moriarity, that interest ended once Moriarity was presumably located in the motel. Murdering the victim would therefore be utterly extraneous and unconnected to the kidnapping's objective of locating Moriarity. The record is consistent with the interpretation that defendant at that time, and at the moment Farrell asked for the shotgun, formulated a new and separate intent to facilitate a murder. "The record is equally consistent with the view that the kidnaping[ ] w[as] completed before the murder[ ], which followed as an afterthought." (*Seiterle* v. *Superior Court* (1962) 57 Cal.2d 397, 401 [20

Cal.Rptr. 1, 369 P.2d 697].) The trial court therefore did not err by concluding that separate sentences were appropriate in light of defendant's distinct multiple criminal objectives.

III*

. . . . . . . . . . . . . . . . . . . .

The judgment of conviction is affirmed.

Channell, J., and Perley, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 23, 1989. Mosk, J., was of the opinion that the petition should be granted.

---

*See footnote, *ante,* page 184.