Filed 3/7/13  P. v. Ramsey CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JEFFREY LANG RAMSEY,<br><br>    Ramsey and Appellant. | A131760<br><br>(Sonoma County<br>Super. Ct. No. SCR579874) |

Defendant Jeffrey Lang Ramsey was convicted by a jury of corporal injury to a cohabitant (Pen. Code, § 273.5, subd. (a)),[1] and making criminal threats (§ 422).  He was found by the court to have committed a prior strike offense (§ 1170.12) and a prior serious felony (§ 667, subd. (a)(1)), and a prior term in prison (§ 667.5, subd. (b)).  He was sentenced to a total of 11 years in prison consisting of the midterm of three years for corporal injury to a cohabitant, doubled pursuant to the three strikes law, plus five years for the prior serious felony, and other concurrent sentences.  Ramsey argues that the judgment must be reversed because of evidentiary and instructional errors, that the court abused its discretion when it withdrew its approval of his no contest plea, and that one of his concurrent sentences was unauthorized.

Ramsey's principal contention is that the court erred when it excluded defense testimony suggesting that the victim might have fabricated her accusations in order to steal Ramsey's property.  We conclude that the court acted reasonably in excluding this

---

[1] Unless otherwise indicated subsequent statutory references are to the Penal Code.

1

testimony under Evidence Code section 352. We also reject all of Ramsey's additional arguments other than the challenge to the unauthorized concurrent sentence. We remand for correction of this part of the sentence, but otherwise affirm.

## I. **BACKGROUND**

Jane Doe testified that she and Ramsey dated sporadically beginning in 2006 or 2007. In March 2010 they were living together in an upstairs bedroom in a house on Sonoma Avenue in Santa Rosa. The other upstairs bedroom was occupied by Rickey Collins. Other occupants of the home at that time included Ed Ballard, Maurice Pichon, Star Dukes, John Locke, and William Sea. The house was, in Collins's words, "very volatile." Santa Rosa Police Officer Mark Martin testified that he was dispatched to the house at least 15 or 20 times in the one and a half years he patrolled the area. Virtually every time he went to the house different people were living there and someone was under the influence of drugs. Collins testified that Doe and Ramsey were habitual methamphetamine users.

Doe testified that she and Ramsey drank alcohol and used meth on March 13, 2010. They argued about drugs and he was angry that she was not going to get more. Other people in the house tried to intervene to stop the arguments. Locke testified for Ramsey that when he got between Ramsey and Doe, she threw a can of vegetables at Ramsey and hit him in the mouth. At that point Locke decided "I'm getting out of here," and he, Ballard, Sea, and Star left to go to a motel. They invited Doe to join them but she declined. Doe denied hitting Ramsey with the can, but acknowledged refusing the offer to go to a motel. Locke said that when he and the others returned to the house after failing to find a motel room, "yelling [was] still going on" and "[w]e knew the police were going to show up."

Doe testified that she and Ramsey stopped arguing, made up, and fell asleep with the bedroom door closed. She woke up and had to go to the bathroom. To get out of bed she had to crawl over Ramsey, and needed his help to do so. When she asked for his assistance he "just went crazy" and "started beating [her] up." Doe testified: "[H]e goes into rages. Anything can trigger Mr. Ramsey off. . . . [Y]ou could be sitting there one

2

minute and be getting along fine, and then he would just grab you and beat the holy hell out of you."

Ramsey got on top of Doe, straddled her, and said that he was going to kill her. He bit her nose, ear, and finger. He head-butted her in the forehead and chest. He pulled her hair and held a knife to her throat. He choked her, and repeatedly said that he would kill her. Doe could not breathe and lost consciousness. Her next memory was gasping for air, and seeing Dukes and Sea standing by the open bedroom door. Ramsey got off her and she went downstairs screaming, "He's going to kill me. He's going to kill me."

Collins heard the commotion and screaming in Doe and Ramsey's bedroom. He opened his bedroom door and, looking through the open door to Doe and Ramsey's bedroom, saw Ramsey straddling Doe, bite her on the face, and "chok[e] her out." Collins worried that Ramsey "might have been so enraged that he didn't realize the extent of his actions, and that it could perhaps end . . . very fatally." Doe was bleeding from her head when she went downstairs, and "everybody was imploring her to go to the hospital, because she was seriously injured."

The police were summoned and Officer John Whitten responded to the call at 1:20 a.m. on March 14. Whitten testified that Doe came out of the house crying, shaking, and bleeding. She appeared to be very drunk. She said that Ramsey punched her, bit her ear and finger, held a knife to her throat, and tried to kill her.

Whitten arranged for Doe to receive medical treatment, and she arrived at Santa Rosa Memorial Hospital at 1:50 a.m. She reported being hit in the ribs, bitten on the head and finger, and choked until she passed out. Her injuries were consistent with her report. Her ear was lacerated, her earring was torn out, and she had abrasions on the sides of her nose and a finger, matching the bites she described. She also had apparently trauma-inflicted abrasions on her neck.

When Whitten interviewed Ramsey at the house, Ramsey initially said that he had been asleep and denied knowing how Doe was injured, but eventually he said that he grabbed Doe to prevent her from injuring herself and they had fallen to the floor. The

3

emergency room physician who examined Doe opined that her injuries were not consistent with a fall.

Ramsey told Whitten that Doe had hit him in the face with a can of soup. Whitten testified that he asked Ramsey whether he was injured, and Ramsey "proceeded to pull down his bottom lip to show that he had some injuries. I didn't see any major swelling, lacerations, busted lip. I did notice that there was some red particulate, possibly blood, on the bottom of his teeth." Whitten found bloodstains on the sheets of Doe and Ramsey's bed. Ramsey said that the blood was his, and was caused by Doe's assault on him. Whitten did not have the sheets tested to confirm the source of the bloodstains because Doe was the only one at the scene who was bleeding. Whitten arrested Ramsey.

Doe told Whitten that Ed Ballard broke up the assault. She said that Ballard came into the room, told Ramsey to drop the knife, and he did. Whitten found a knife lying next to the bed. Ballard identified the knife for Whitten as the one he saw Ramsey holding. Doe testified at trial that she could not remember whether Ramsey threatened her with the knife before or after he choked her. When she testified at the preliminary hearing, she could not remember being threatened with a knife during the assault.

At trial, Doe said that she still had feelings for Ramsey and did not want to testify against him. However, by March 2010 she wanted to end the relationship "[b]ecause of the drugs, the alcohol, and the arguing, the violence." He had pulled her hair out, brandished a butcher knife at her, and threatened to kill her. "[I]t was bad," she said, and "[i]t was getting worse." Doe admitted that she had prior felony convictions for assault with a deadly weapon and driving under the influence.

Maurice Pichon testified for the defense that Doe wanted him to cooperate with her in a March 13 scheme to get Ramsey arrested. Doe told Pichon that she was going to plant a knife in their room, get Ramsey mad enough to grab it, and then fall down the stairs. When that happened she wanted Pichon to call the police, and she and Ballard would tell the police that Ramsey assaulted her. When Pichon refused to go along, Doe threatened to hit him in the face with a baseball bat.

4

Collins testified that he was in Pichon's room that day when Doe came in and asked them to call the police and have Ramsey arrested because she feared for her life. Doe "was going around knocking on everyone's door. She was frantic, saying that she felt that Mr. Ramsey was going to do her great bodily harm." Ramsey came into the room holding a knife, calmed Doe down, and they went back upstairs to their room. Collins testified that Doe later returned to Pichon's room, and she and Pichon had a fight about how to inject Oxycontin. The fight escalated to the point where Pichon threatened Doe, and Doe called the police. Doe told the police that she wanted Pichon out of the house, falsely claiming that he was in violation of a restraining order.

Locke testified that Doe was "pretty much intoxicated on one thing or another the whole time I've known her," and on March 13 she was going around the house "ranting" and "raving." According to Locke, Doe called the police on Pichon after she and Pichon had an argument about the price of a scale. Doe said "[s]he was done with [Pichon], and he had to go." Locke added, "She's said that about several people."

Pichon was arrested after police found 16 different types of pills in his room and text messages about drug deals on his cell phone. When he testified at trial, Pichon was appealing a conviction for possession of prescription drugs for sale. He conceded that he was "a bit frustrated" with Doe and a "slight bit" angry with her for causing him to be arrested.

Ann Meacham, described by Doe as Ramsey's ex-girlfriend, testified for the defense. She had twice picked Ramsey up late at night at the Sonoma Avenue house to get him away from Doe. Doe was "staggeringly drunk" on the first occasion, and was swinging her fists at him on the second. Meacham said of Ramsey that Doe was "the love of his life."

There was also evidence that Ramsey had previously committed domestic violence against other girlfriends. One, L.C., testified for the prosecution, and another, S.S., testified for the defense. L.C. dated Ramsey for eight weeks beginning in May 2001. On July 21, 2001, L.C. drove to Ramsey's storage unit in Santa Rosa to return some of his property. He asked her for a lift and got angry when she refused. She tried to drive

5

away, but Ramsey grabbed her car keys and phone, punched her in the back, and choked her until she passed out. Fearing for her life, L.C. tried to run away but Ramsey tackled her, pulled her pants down to her knees, and dragged her by the hair back to the car. He got out a tape recorder, recorded her screams for help, and played them back to her. He telephoned S.S., and told S.S. to warn L.C. not to report the assaults. He threatened to kill L.C. and S.S. if L.C. refused to record a statement saying that the incident was her fault. When she did so and promised she would not go to the police, he let her go.

On November 13, 2001, L.C. saw Ramsey riding in a car by her apartment like he was stalking her. She went outside, and the car turned around and stopped next to her. Ramsey yelled and swore at her, and made threats such as "[t]he boys . . . are going to come get you," and L.C. feared for her life. He told her that the next time he choked her, his eyes would be the last thing she ever saw. L.C. suffered from post-traumatic stress disorder as a result of these incidents, and moved to another state to get away from Ramsey.

Ramsey and S.S. had a romantic relationship beginning in the 1990's, and on June 23, 1998, he punched her in the face. She wrote a note at the time reporting repeated threats from Ramsey, and "weekly incidents, bruises, cuts, and broken household items, followed by periods of remorse and kindness." She remembered seeing L.C. at the storage locker in July 2001, and hearing her argue with Ramsey, but did not witness an altercation between them. S.S. remembered Ramsey being "shaken up" after the incident, and L.C. being upset when S.S. called her that night at Ramsey's request. S.S. said that Ramsey had a drinking problem at that time.

At the time of trial, S.S.'s roommate characterized her as Ramsey's "best friend in the whole world." S.S. said that Ramsey was a "different person" after he was released from prison in 2003. He was not so quick to anger, and thought before acting. On the night of the incident with Doe, S.S.'s roommate picked Ramsey up from Sonoma Avenue at his request, and took him to their house. S.S. begged Ramsey not to return to Sonoma Avenue, but took him there around 11:30 p.m. Doe's screaming could be heard from outside the house. S.S. went with Ramsey and tried to calm Doe down. She appeared to

6

be drunk, and "alternate[d] between raging, ranting at [Ramsey] and then saying she loved him . . . ." S.S. worried for Ramsey's safety and told him he should leave, but S.S. left alone after about an hour when the situation seemed calmer.

Evidence and arguments were presented to the jury over the course of nine days. The jury deliberated a little over one hour, and convicted Ramsey of corporal injury to a cohabitant and making criminal threats, but acquitted him of felony assault with a knife (§ 245, subd. (a)(1)), and misdemeanor assault (§ 240) as a lesser included offense of that charge.

# I. DISCUSSION

## A. Exclusion of Defense Evidence

Ramsey argues that the trial court erred when it prevented him from impeaching Doe with evidence suggesting that she falsely accused him of assault in order to steal his property. As defense counsel stated in the trial court, Doe allegedly had a "habit of ejecting men from the residence and then going through all their property."

### (1) Pichon's Testimony

Officer Martin testified at trial that the owner of the Sonoma Avenue house did not live there, and that he "heard from different people all the time, saying that they were in charge of the home." But "the person who I guess had the most clout there was a guy named Kenneth Cropley. He was supposed to be the guy who was the liaison to the owner." At an Evidence Code section 402 hearing, Pichon testified that he paid rent to Cropley before Cropley was put in jail for assaulting Doe and Ramsey. After Cropley was incarcerated, Doe "tried to take the position" of the landlord's agent. Pichon stated, "For example, when Ken Cropley left, she cleared out his possessions, stole some, sold some, I don't know what exactly happened; but the room was completely cleared out. She rented that out to Edward Ballard for money." Star Dukes also paid rent to Doe.

Pichon said that he was arrested for violating a restraining order directing that he stay away from Cropley, but was able to move back into the Sonoma Avenue house after Cropley was arrested. Pichon found most of his things where he had left them, but knew that his room had been broken into while he was away because Collins and Doe had some

7

of his property. Collins had a lot of his clothes, CD's, and DVD's, and Doe had his computer chair and speakers. Both refused Pichon's demands that they return his property. After his arrest on March 13, he had friends go to the house to retrieve his property but all of it was gone. People at the house told him that Doe had stolen it. Pichon said that Doe also stole property from Mario Morales, another former resident of the house who went to jail. Doe had Ballard kick down the door to Morales's room, and Pichon saw Doe remove property from it. Pichon said that Doe sold some of Morales's property to thrift stores. He saw the property loaded into her vehicle and knew where she was going. Doe would also talk to him "about setting [Ramsey] up so she can get him out of the house and obtain his belongings."

Ramsey argues that Pichon's testimony about Doe stealing property from his housemates, including him, was admissible under Evidence Code section 1101, subdivision (b), as evidence of a common plan or scheme. In Ramsey's view, "Doe clearly had a two-step dance: (1) befriend a male house mate; and (2) have him arrested for assault or assault-related offenses in order to obtain their rooms, property and money." Ramsey contends that the testimony was also admissible as evidence of moral turpitude that could be taken into account in assessing Doe's credibility. The court sustained the prosecution's Evidence Code section 352 objection to the evidence, stating that it did not "want to be getting off on side shows about things that really don't go to the heart of the issue, because it will be very time consuming, not relevant to the issues." Ramsey argues that exclusion of this evidence violated his constitutional rights to confrontation, cross-examination and due process.

There was neither an abuse of discretion under Evidence Code section 352, nor a violation of Ramsey's constitutional rights (see, e.g., *People v. Abilez* (2007) 41 Cal.4th 472, 503 [discretionary evidentiary ruling did not violate right to present a defense]; *People v. Gurule* (2002) 28 Cal.4th 557, 620 [ordinary rules of evidence generally do not infringe on the right to present a defense; rejecting argument that restricted cross-examination violated rights to confrontation, due process, and a fair trial]; *People v.*

8

*Cunningham* (2001) 25 Cal.4th 926, 999 [exclusion of defense evidence on a subsidiary point is not a deprivation of due process]).

The court could reasonably find, for a number of reasons, that the evidence of Doe's theft had little probative value. First, there was no evidence that Doe had a pattern of using arrests to accomplish her thefts. Nothing suggests that Doe orchestrated Cropley's or Morales's arrests. Pichon stated that Ramsey paid rent to Cropley "before Jane Doe got [Cropley] upset and he got put in jail," but Pichon acknowledged "I wasn't there for that event." The only arrest that it was shown Doe precipitated was Pichon's March 13 arrest for selling controlled substances, and the jury was informed of that fact. Second, many of Pichon's accusations were speculative. He had no first-hand knowledge, for example, of whether Doe took his property after the March 13 arrest, whether she gave or sold his property to Collins, or how she disposed of Morales's property. Third, evidence that Doe planned to falsely accuse Ramsey and had a motive to do so was cumulative of Pichon's testimony that Doe asked for his help in staging an assault, and Doe's testimony that she wanted out of an abusive relationship. Fourth, to the extent the evidence was offered to show Doe's moral turpitude, it was cumulative of, and weaker than, the felony convictions she admitted for assault with a deadly weapon and driving under the influence.

The court could also reasonably find that testimony about Doe's dealings with the rooms and property of other residents in the Sonoma Avenue house would consume an undue amount of time. The court noted that such evidence would raise issues about whether Doe was acting as the landlord's agent and her rights in that capacity. Ramsey minimizes these concerns as "a red herring," but they were squarely raised by Pichon's Evidence Code section 402 testimony that Doe tried to take over Cropley's position as the landlord's agent after Cropley's arrest, and that she was renting out rooms and collecting rent.

The court was well within its discretion under Evidence Code section 352 to exclude Pichon's testimony about Doe's alleged "common plan and scheme" to have her housemates arrested in order to steal their property.

9

(2)  <u>Locke's Testimony</u>

Locke testified at an Evidence Code section 402 hearing that Doe hired him to clean up the Sonoma Avenue house after everyone was evicted and a bank took title. Doe agreed to pay him $500 from a check she received, and told him to follow her and William Sea to a check cashing place. Sea had moved into Doe's room the night after Ramsey was arrested. Locke was driving behind Doe's car and saw Doe talking on the phone. When he stopped at a gas station, two police cars pulled up and an officer told him that they had received an anonymous phone call from someone who said "that somebody was following them." He told the officers that Doe was trying to keep him from getting the money she owed him. He was not arrested, and was never paid for his work.

Ramsey contends that the trial court erred when it sustained the prosecution's Evidence Code section 352 objection to Locke's testimony concerning the check cashing incident. That evidence did not fit within Doe's alleged practice of getting her housemates arrested to take their property, and it was offered solely to impeach Doe with an act of moral turpitude. Doe's alleged breach of an agreement with Locke had little probative significance on her credibility compared to the evidence the court allowed of her felony convictions. Admission of the check cashing incident would also have opened the door to time-consuming questions about the nature and quality of Locke's work. The court reasonably found the check cashing incident "extraneous" to the questions before the jury, and reasonably declined to permit "a side show about contractual issues." There was no abuse of discretion in excluding this evidence.

Ramsey also argues that the court should have permitted Locke to testify that Doe took up with Sea immediately after Ramsey was arrested. However, the jury knew that Doe wanted to end her relationship with Ramsey, and the court correctly excluded the Sea evidence as irrelevant, stating, "We need to . . . confine the trial to the issues at hand."

10

B.  Admission of Prior Acts of Domestic Violence

Ramsey contends that the court erred when it admitted evidence of his prior acts of domestic violence against L.C. and S.S.  His threshold argument is that Evidence Code section 1109, which, subject to Evidence Code section 352, permits introduction of such evidence to prove propensity, violates his right to due process under the federal Constitution.  However, the reasoning of *People v. Falsetta* (1999) 21 Cal.4th 903, 917 (*Falsetta*) is controlling authority to the contrary.  (*People v. Rucker* (2005) 126 Cal.App.4th 1107, 1120; *People v. Brown* (2000) 77 Cal.App.4th 1324, 1334.)  Ramsey submits that *Falsetta* was wrongly decided.  Perhaps, but we are bound to follow it.  (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455.)

Ramsey also argues that the court abused its discretion when it overruled his Evidence Code section 352 objections to introduction of the incidents involving L.C. and S.S.  (*People v. Johnson* (2010) 185 Cal.App.4th 520, 531 (*Johnson*) [court may exclude evidence of past domestic violence if the probative value of the evidence is substantially outweighed by its prejudicial impact; such rulings are reviewed for abuse of discretion].)  Relevant factors to consider in deciding whether a prior act may show a propensity for violence include:  (1) the temporal proximity of the prior and charged offenses (*Falsetta*, *supra*, 21 Cal.4th at p. 917; *Johnson*, *supra*, 185 Cal.App.4th at p. 534); (2) the similarity between the prior and charged offenses (*Falsetta,* at p. 917; *Johnson,* at p. 531); (3) whether the prior offenses were more "inflammatory" than those charged (*Johnson,* at pp. 533-534; and *id*. at fn. 11); and (4) whether the uncharged offenses arose from independent sources, "reduc[ing] the danger of fabrication" (*id*. at p. 533).  Ramsey contends that all of these considerations militated against admission of his prior domestic violence, but the trial court could reasonably conclude otherwise.

(1)  L.C.

The incidents with L.C. were not remote.  They happened on July 21 and November 13, 2001, within 10 years of the March 2010 charged offenses, and were thus presumptively admissible under Evidence Code section 1109.  (Evid. Code, § 1109, subd.

11

(e) [acts occurring more than 10 years before charged offense are inadmissible unless admission is in the interest of justice]; *Johnson*, *supra*, 185 Cal.App.4th at pp. 537, 539.) The L.C. incidents and the offenses against Doe were similar to the extent that, among other things, in July 2001 he choked L.C. to unconsciousness, and in November 2001 he threatened to choke L.C. to death. The July 2001 offense against L.C. was no more egregious than the one with Doe, and the November 2001 offense less so. The jury's acquittal of Ramsey of assaulting Doe with a knife showed that it was not inflamed by the evidence of his prior conduct. As for whether evidence of the prior incidents arose from independent sources, nothing suggested that L.C. and S.S. collaborated in reporting the domestic violence they suffered years apart. S.S. testified that she and L.C. were not friends, and that she thought L.C. had falsely accused Ramsey. The court had reasonable grounds to reject Ramsey's Evidence Code section 352 objection to admission of his domestic violence against L.C.

    (2) <u>S.S.</u>

Ramsey's 1998 offense against S.S. was deplorable, but less egregious than those charged in this case because he only punched S.S. in the face. His conduct on both occasions was similar to the extent that S.S. reported that he repeatedly threatened her, and Doe reported that he had punched and head-butted her. The court had discretion to admit evidence of the S.S. incident even though it occurred more than 10 years before the one with Doe. (*Johnson*, *supra*, 185 Cal.App.4th at p. 539.) In any event, defense counsel conceded at trial that S.S.'s testimony for Ramsey—that he was peaceable on the night of the incident with Doe, and that he had "changed" after being released from prison in 2003—left S.S. "wide open to impeachment" with evidence of his assault on her. When defense counsel argued that the 1998 assault "could come in for impeachment, but not for propensity," the court observed, "[Y]ou're asking the jury to split hairs," and defense counsel responded, "Okay. I'll accept that, Your Honor." Thus, while admitting evidence of the assault on S.S. was not an abuse of discretion under Evidence Code section 1109, if it were, such an error would have been harmless under

any standard because the jury would have learned of the assault even if it was inadmissible under the statute.

C.  CALCRIM No. 852

The jury was instructed pursuant to CALCRIM No. 852 concerning the prior acts of domestic violence:

"The People have presented evidence of, that the defendant committed domestic violence that was not charged in this case.  Those were the incidents that were referred to against other people.

"Domestic violence means abuse committed against an adult who is a spouse, former spouse, cohabitant, former cohabitant, or a person who dated or is dating the defendant.

"Abuse means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable fear of imminent serious bodily injury to himself or herself or to someone else.

"You may consider this evidence of the domestic violence to people other than Jane Doe only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged domestic violence.  Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt.  A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

"If the People have not met this burden of proof, you must disregard the evidence entirely.

"If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from the evidence that the defendant was disposed or inclined to commit domestic violence and, based on that decision, you can also conclude that the defendant was likely to commit and did commit the alleged incidents, as charged here.  If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all of the other evidence.  It is not sufficient by itself to prove that the defendant is guilty of the crimes

13

charged against Mr. Ramsey as perpetrated against Jane Doe. The People still must prove each charge alleged in this case beyond a reasonable doubt."

Ramsey contends that this standard instruction is improperly argumentative because it directs the jury that it may infer propensity and guilt from the prior acts of domestic violence. However, the substance of this instruction has been upheld as providing necessary and appropriate guidance for the jury's consideration of prior offenses.

*People v. Reliford* (2003) 29 Cal.4th 1007, held that the 1999 version of CALJIC No. 2.50.01, which is "similar in all material respects" to CALCRIM No. 852 (*People v. Johnson* (2008) 164 Cal.App.4th 731, 738-740), "correctly states the law" (*Reliford*, *supra*, at p. 1009). The inferences of propensity and guilt to which Ramsey objects were deemed in *Reliford* to be "reasonable" and "legitimate." (*Reliford* at pp. 1012, 1013.) *Reliford*'s reasoning extends to CALCRIM No. 852. (*People v. Johnson, supra,* at pp. 738-740; see also *People v. Kelly* (1992) 1 Cal.4th 495, 531 [upholding instruction that pinpointed prosecution evidence where instruction stated that the evidence was not sufficient by itself to prove guilt].) We therefore reject Ramsey's instructional argument.

D. <u>Nolo Contendere Plea</u>

Ramsey originally pleaded nolo contendere to charges in the case in exchange for an indicated sentence of nine years in prison. He contends that the court abused its discretion when it withdrew its approval of the plea, and thus that the case should be remanded for entry of judgment on the plea.

(1) <u>Record</u>

The plea agreement was set forth by the court as follows: "The Court has indicated that, if Mr. Ramsey pleads to the sheet, he will be given the following sentence: On Count I [corporal injury to a cohabitant], the mid term of three years, the strike will be stricken, and [defense counsel] will do a *Romero* motion. Counts II [assault with a knife] and III [criminal threats] will run concurrent. He will get one year for the 422 enhancement [use of a knife pursuant to § 12022, subd. (b)(1)], and five years for the 667 (a)(1) enhancement [prior serious felony conviction], for a total of nine years, which he

14

will serve at half time." Defense counsel stipulated to a factual basis for the plea based on the police report.

In his presentence report, the probation officer stated that Ramsey had told him " 'I'm not guilty of these charges, period.' " He said that Doe was " 'hell bent on sending me back to prison,' " and denied that he caused her injuries. Ramsey described at length evidence that would support his defense. He said that because of "his reportedly compromised mental health," he could not remember his "early court hearings or plea agreement offers he received." He "expressed frustration with the legal process, specifically because he felt he was going to be punished for a crime he did not commit," and alleged that his counsel "did not represent me one hundred percent." The probation officer said that he informed Ramsey that he would not be entitled to " 'half time' presentence custody credit, due to his prior conviction for a felony and the nature of the instant offense. Ramsey replied that he only entered his plea on the understanding that he would receive 'half time' credits and that if he did not, he wanted to withdraw his plea."

The transcript of the sentencing hearing reads in relevant part:

"The Court: Mr. Ramsey is on for sentencing today, and there's also a *Romero* motion on calendar. The Court has reviewed the probation report and the other file materials, and the Court is very . . . concerned that Mr. Ramsey hasn't accepted any responsibility and feels that . . . he's being wrongfully incarcerated for this offense. So I'm prepared to allow Mr. Ramsey to withdraw his plea and start over again, because I'm not comfortable going forward sentencing Mr. Ramsey.

"And the other thing is, I believe that the charges would be an 85 percent sentence, which I know, when we talked at the time of the . . . waiver [of Ramsey's trial rights], that you were talking in terms of a 50 percent; but I don't think that's possible, given the charges.

"But the reason I'm allowing him . . . to withdraw his plea is because . . . I believe that you believe that the victim was lying, and that these acts just didn't occur; and for that reason, I'm not comfortable sentencing you to State Prison.

15

"[Defense Counsel]: Understood. And Mr. Ramsey, is it your intention to withdraw your . . . no contest plea at this point?

"[Ramsey]: Yes. I mean, I, that's your recommendation.

"[Defense Counsel]: Yes.

"The Court: . . . I'll go ahead and allow him to withdraw the plea.

"[The Prosecutor]: . . . [W]e would object . . . and . . . would ask for Mr. Ramsey to file a motion with the Court.

"The Court: I'm not comfortable with that. . . . [B]ased upon the fact that he says these incidents never happened . . . I'm not going to go through with sentencing him. He's going to have a trial on these matters; and once the trial is completed, he will be sentenced accordingly.

"[The Prosecutor]: "I understand that. . . . [T]he court's indication . . . is not a promise or a guarantee from the Court. And the Court can change its mind.

[¶] . . . [¶] . . .

"The Court: . . . So I would like to put this on next week for resetting the trial, and I think that's the best way to handle it.

"[Defense Counsel]: That's acceptable.

"The Court: So the plea is withdrawn."

(2) Review

Section 1192.5 provides that a court that has approved a plea agreement "may, at the time set for . . . pronouncement of judgment withdraw its approval in the light of further consideration of the matter." "[I]mplicit in the language of section 1192.5 is the premise that the court, upon sentencing, has broad discretion to withdraw its prior approval of a negotiated plea." (*People v. Johnson* (1974) 10 Cal.3d 868, 873.) "Such withdrawal is permitted, for example, in those instances where the court becomes more fully informed about the case [citation], or where, after further consideration, the court concludes that the bargain is not in the best interests of society." (*People v. Superior Court (Gifford)* 53 Cal.App.4th 1333, 1338). In making that determination, the court

"can be expected to consult the probation report . . . ." (*People v. Stringham* (1988) 206 Cal.App.3d 184, 194.)

Ramsey acknowledges the court's discretion to withdraw approval of a plea agreement, but argues that the discretion was abused here because the court gave two invalid reasons for its decision. First, the court stated that the credit Ramsey would receive while serving his state prison sentence would be less than he anticipated when he entered his plea. Ramsey observes that the court and the probation officer were mistaken in believing that he would receive 15, rather than 50, percent credit (§§ 2933.1, subd. (a), 667.5, subd. (c)), and the People do not attempt to defend the court's decision on this ground.

Second, the court noted Ramsey's profession of innocence in the presentence report. Ramsey contends that the court "may not arbitrarily demand the defendant admit guilt in order to plead no contest." The People assert "[i]t is beyond illogical to argue that a trial court is without discretion to reject a plea bargain on the basis that it believes the defendant may be innocent," but Ramsey has a point. If the plea has a factual basis, a defendant may plead nolo contendere to accept punishment without admitting guilt. (*In re Alvernaz* (1992) 2 Cal.4th 924, 940-941, fn. 9, citing *North Carolina v. Alford* (1970) 400 U.S. 25.) A defendant who does so should be able to tell a probation officer preparing a presentence report that he or she is innocent without risking disapproval of the no contest plea because of that statement.

The problem for Ramsey is that he did not just profess his innocence to the probation officer, he applied to withdraw his no contest plea at the sentencing hearing. (*People v. Gonzalez* (1993) 13 Cal.App.4th 707, 715 [a defendant may orally apply to withdraw the plea at a sentencing hearing].) As we read the transcript, the court did not disapprove Ramsey's plea. It granted, over the prosecution's objection, Ramsey's application to withdraw his plea. The court stated that the plea was "withdrawn," not that it was disapproved, and Ramsey cannot properly complain of a decision he requested in open court.

17

Ramsey claims that he "was misled into expressing a desire to withdraw his plea" because of the misunderstanding about the credits he would receive. But insofar as it appears from the record, he may have had second thoughts about his plea apart from the credit question. He did not simply tell the probation officer that he was innocent. He elaborated on the merits of his case, expressed frustration with the legal process, and said that he could not even remember some of the proceedings in the case. (See *People v. Reza* (1984) 152 Cal.App.3d 647, 652, discussing *People v. Clark* (1968) 264 Cal.App.2d 44 ["defendants' protestations of innocence were reasonably treated by the trial court as a motion to withdraw the pleas of guilty"].)

Moreover, there would be no cause to reinstate Ramsey's no contest plea even if, as the parties presume, the court disapproved it. While a court cannot on its own motion disapprove a guilty plea on the ground that it believes the defendant is innocent, it may disapprove the plea on that ground where, as here, the defendant seeks to withdraw it. (See *People v. Reza*, *supra*, 152 Cal.App.3d at pp. 652-653 [in *People v. Thompson* (1970) 10 Cal.App.3d 129, and *People v. Superior Court (Barke)* (1976) 64 Cal.App.3d 710, "the trial courts' rejection of the pleas 'on grounds of innocence' was an abuse of discretion, because the *defendant* did not make the motion to withdraw the plea"].)

Ramsey's argument for entry of judgment on his no contest plea is unsupported by the record.

E. Unauthorized Concurrent Sentence

The court imposed a concurrent one-year sentence under section 667.5, subdivision (b) as an enhancement for Ramsey's prior term in state prison. It is undisputed that the court erred in so doing because the statute requires that the enhancement be sentenced consecutively. (See *People v. Savedra* (1993) 15 Cal.App.4th 738, 746-747.) The court had the power, with a statement of reasons, to strike the enhancement. (*People v. Jordan* (2003) 108 Cal.App.4th 349, 369.) The parties agree that a remand to correct this unauthorized portion of Ramsey's sentence is appropriate and so do we.

### III. DISPOSITION

18

The judgment of conviction is affirmed. The concurrent sentence imposed for the section 667.5, subdivision (b) enhancement is reversed, and the balance of the sentence is affirmed. The case is remanded with directions to impose a consecutive sentence on the section 667.5 subdivision (b) enhancement, or strike it. The trial court is directed to prepare an amended abstract of judgment reflecting the corrected sentence, and forward a certified copy to the Department of Corrections and Rehabilitation.

_____
Siggins, J.

We concur:

_____
Pollak, Acting P.J.

_____
Jenkins, J.

19