[No. B188294. Second Dist., Div. Eight. Mar. 30, 2006.]

THE PEOPLE, Plaintiff and Appellant, v.
GEORGE DANIEL PETRISCA, Defendant and Respondent.

COUNSEL

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Robert M. Snider, Lance E. Winters and Laura J. Hartquist, Deputy Attorneys General; Steve Cooley, District Attorney, William Woods and Tracey Lopez, Deputy District Attorneys, for Plaintiff and Appellant.

Ronald B. Talkov for Defendant and Respondent.

OPINION

FLIER, J.—

## INTRODUCTION

George Daniel Petrisca, who stands charged with murder and other felonies in connection with driving his vehicle at excessive speeds on the wrong side of the road, successfully moved to recuse the entire office of the District Attorney of Los Angeles County (DA) from prosecuting the case again him. He based his motion on the fact that one of the deceased victim's sons, Jeffrey Semow, was a deputy district attorney (DDA) of Los Angeles. Petrisca argued this relationship created a conflict of interest for the DA and made it unlikely he would receive a fair trial. The trial court ordered the recusal pursuant to Penal Code section 1424 after finding a prosecutor in the DA's office would "feel extra pressure" and be "more uncomfortable" than a prosecutor in another agency.[1] We reverse the recusal because the court applied the wrong legal standard in making its decision and no substantial evidence supports it.

## FACTUAL AND PROCEDURAL BACKGROUND

The evidence at Petrisca's preliminary hearing shows that on December 11, 2004, Petrisca drove his vehicle at high speeds through two red lights, darting in and out of traffic on the wrong side of the road. Petrisca almost hit two vehicles before eventually colliding with two other cars, one driven by Shirley Semow, who died as a result of her injuries. Petrisca had previously completed traffic school. The hearing magistrate denied Petrisca's motion to dismiss the charges and held him to answer at trial.

---

[1] All code references are to the Penal Code.

The day after the preliminary hearing, the DA filed an information charging Petrisca with murder (§ 187, subd. (a)), manslaughter (§ 192, subd. (c)(1)), and assault with a deadly weapon by means likely to produce great bodily injury (§ 245, subd. (a)(1).) James Falco, the DDA assigned to prosecute the case, conducted the preliminary hearing and was in charge of determining the crimes to be charged.

About four months later, Petrisca filed a motion recusing the DA from prosecuting the case. Petrisca argued the DA had an inherent conflict of interest because the deceased victim's son, Jeffrey, was a DDA and used his influence to make sure Petrisca was overcharged. He further claimed a conflict existed because the victim's family had initiated a civil lawsuit against Petrisca, and the victim's other son, Glenn Semow (who was not employed by the DA's office), had threatened to take a harsh stance at any sentencing hearing. The Attorney General's office opposed Petrisca's motion.

The trial court conducted an evidentiary hearing, during which Falco testified. This evidence, together with the declarations filed in support of and in opposition to the motions, revealed the following: The DA's office is the largest prosecutorial agency in the nation, with 948 prosecutors, 239 investigators, and 775 support personnel. There are 36 offices throughout the county, including Central Trials in downtown Los Angeles and nine branch offices where adult felony trials are typically conducted. Falco and Jeffrey worked in the same branch office before 2001, after which Falco was transferred to a different branch office (the Van Nuys branch). During the short time they worked in the same office, Falco and Jeffrey would sometimes greet each other in the hallway. But they never worked together, ate lunch together, or socialized outside of the office. Also, Jeffrey had never supervised Falco.

At the outset of the case, bureau director John Zajec, who oversees the branch offices (but not Central Trials), decided it had to be assigned to someone who did not have a relationship with Jeffrey. Zajec himself never worked or had a social relationship with Jeffrey. Former head DDA Phil Wynn, who Zajec supervised, assigned the case to Falco. While Falco discussed the case with Wynn and Zajec, he was from the outset given complete discretion regarding how to charge Petrisca and proceed with the case. Based upon the alleged facts that Petrisca drove his car recklessly at approximately 67 miles per hour in a 35-miles-per-hour zone; drove through two red lights; drove down the wrong side of the street, heading straight for another vehicle, swerving away from that vehicle at the last minute, and eventually hitting the vehicle driven by the victim; and that he recently attended traffic school, Falco independently theorized that Petrisca acted with malice. Falco concluded Petrisca "was driving literally like he wanted to kill someone," and charged him accordingly.

Falco never spoke to Jeffrey before charges were filed against Petrisca, and has never spoken with Glenn. Later, when Falco did talk with Jeffrey, he explained to him that he would be treated like any other family member who had lost a loved one, and that he would keep him updated on the status of the case. Jeffrey assured Falco that was all he expected. Jeffrey did not interfere in any way in the prosecution of the case, and Falco never altered his course of action based upon his contact with Jeffrey.

When asked whether he felt any pressure from his superiors regarding the case, Falco testified, "I'm under pressure whenever I handle a case where someone has been killed. I've got family members who are looking to me for some form of justice, even though, you know, there is no real justice when you lose a loved one. [¶] I mean, I can't bring that person back. All I can do is prosecute an individual who is charged with—allegedly charged with committing a crime." When further asked whether he felt any "extra pressure" because the victim was a relative of a DDA, Falco said, "I put pressure on myself because, yes, I know Mr. Semow. We don't have a personal relationship. We have a professional relationship. [¶] I have made filing decisions on this case that I feel I can present to a jury; and whether or not all 12 jurors would agree with my theory, I mean, that remains to be seen. [¶] But, yeah, there is pressure on me. Obviously, I have a very big office, and I see people, and people say to me, oh, you're handling Jeff Semow's mother's case? [¶] So, yes, there is pressure. There's pressure, but it's not external where people are telling me how I should handle this case, what I should do. Just the fact people are aware that I'm prosecuting an individual who is charged with taking the life of a deputy D.A.'s mother. [¶] So, yeah, there is pressure there, and some of it is, you know, I put pressure on myself." Falco further testified he felt "uncomfortable" in handling the case because "I'm put in a position where I'm creating my own feeling of being uncomfortable, because I'm putting pressure on myself."

At the close of the hearing, the trial court specifically found the DA's office "has handled the case appropriately to date" and that "all the charging decisions that were made were handled in an appropriate fashion." When framing the issue of whether recusal of the entire DA's office was appropriate, the court said, "So . . . the question that I have to ask myself is whether a [DDA], whether it's Mr. Falco or somebody else, is going to feel more pressure and more uncomfortable because it's the mother of a prosecutor in his own office than would an outside prosecutor." The court concluded, "I think, all things considered, although I do believe the [DA's] office has handled everything appropriately to date, I think any prosecutor in this office would feel—because of the very close relationship would feel more pressure and more uncomfortable than a prosecutor from another agency. [¶] . . . [¶] So I'm granting the motion to recuse the [DA's] office."

The Attorney General and the DA appealed the ruling. (See § 1424, subd. (a)(1).) We expedited briefing and oral argument and now reverse the ruling.

## DISCUSSION

1. *Standard of Review*

"On appeal, a trial court's ruling on a motion for an order recusing a member of the district attorney's office, or the office as a whole, for a conflict of interest is reviewed for abuse of discretion, and its findings as to any underlying facts are reviewed for substantial evidence." (*People v. Griffin* (2004) 33 Cal.4th 536, 570 [15 Cal.Rptr.3d 743, 93 P.3d 344], citing *People v. Eubanks* (1996) 14 Cal.4th 580, 594 [59 Cal.Rptr.2d 200, 927 P.2d 310].)

2. *The Standard for Recusal*

■ Section 1424, subdivision (a)(1) provides that a recusal motion "may not be granted unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial." This statute replaced an earlier rule announced under *People v. Superior Court (Greer)* (1977) 19 Cal.3d 255, 267, 269 [137 Cal.Rptr. 476, 561 P.2d 1164], which allowed a district attorney to be disqualified "when [a] judge determines that the attorney suffers from a conflict of interest which might prejudice him against the accused and thereby affect, or *appear to affect*, his ability to impartially perform the discretionary functions of his office." (*Id.* at p. 269, fn. omitted, italics added.) Section 1424 was enacted in 1980 "in response to the substantial increase in the number of unnecessary prosecutorial recusals under the 'appearance of conflict' standard set forth in [*Greer*]." (*People v. Merritt* (1993) 19 Cal.App.4th 1573, 1578 [24 Cal.Rptr.2d 177], citing *People v. Lopez* (1984) 155 Cal.App.3d 813, 824 [202 Cal.Rptr. 333].)

Section 1424 establishes a two-part test: "(i) is there a conflict of interest?; and (ii) is the conflict so severe as to disqualify the district attorney from acting? Thus, while a 'conflict' exists whenever there is a 'reasonable possibility that the DA's office may not exercise its discretionary function in an evenhanded manner,' the conflict is disabling only if it is 'so grave as to render it unlikely that defendant will receive fair treatment.' [Citation.]" (*People v. Eubanks, supra,* 14 Cal.4th at p. 594, citing *People v. Conner* (1983) 34 Cal.3d 141, 148 [193 Cal.Rptr. 148, 666 P.2d 5] (*Conner*).) Unlike the appearance of impropriety standard announced in *Greer*, section 1424 "does not allow disqualification merely because the district attorney's further participation in the prosecution would be unseemly, would *appear* improper,

or would tend to reduce public confidence in the impartiality and integrity of the criminal justice system." (*People v. Eubanks, supra,* at p. 592.)

In addition, "[t]he recusal of an entire prosecutorial office is a serious step, imposing a substantial burden on the People, and the Legislature and the courts may reasonably insist upon a showing that such a step is necessary to assure a fair trial." (*People v. Hamilton* (1989) 48 Cal.3d 1142, 1156 [259 Cal.Rptr. 701, 774 P.2d 730].) Moreover, "[d]isqualification of an entire prosecutorial office from a case is disfavored by the courts, absent a substantial reason related to the proper administration of justice." (*People v. Hernandez* (1991) 235 Cal.App.3d 674, 679–680 [286 Cal.Rptr. 652].) The showing of a conflict of interest necessary to justify so drastic a remedy must be especially persuasive. (*Id.* at p. 678.)

In reviewing the trial court's ruling in the present case, it may be useful to discuss two cases where section 1424 was applied. In *Conner*, the Supreme Court held the trial court did not abuse its discretion in recusing the entire Santa Clara County District Attorney's Office from prosecuting charges arising out of an attempted escape from the courtroom. The defendant was in custody on several pending felony charges. During his escape attempt, he stabbed and seriously injured the bailiff and took away the bailiff's handgun. About the same time, the DDA entered the courtroom and made eye contact with him. The defendant then swung the handgun toward the DDA and fired at him but missed as the DDA raced out the courtroom door. The defendant escaped but was promptly apprehended. The DDA reported the incident to his supervisor, discussed his experience with 10 of the 25 felony prosecutors in his office, and further described the defendant as a dangerous felon and an escape risk during a news media interview. (*Conner, supra,* 34 Cal.3d at pp. 144–145.)

The trial court granted the recusal motion as to the new charges of escape and assault, but denied it as to the other charges that were pending at the time of the courthouse crimes. (*Conner, supra,* 34 Cal.3d at pp. 145–146.) In examining whether the conflict was so grave as to render it unlikely that the defendant would receive fair treatment, the Supreme Court found the relevant factors were the size of the office, the DDA's communication of the experience to his coworkers, the seriousness of the apparent threat to the DDA's safety, and the impact of witnessing the serious injuries inflicted upon the bailiff. The court held there was no abuse of discretion in recusing the district attorney's office from prosecuting charges in connection with the attempted escape, because the DDA was "inextricably involved in the case" and because of the "harrowing" nature of the DDA's experience, which included the threat to his own safety and the impact of witnessing the serious injuries inflicted on the bailiff. The court likewise affirmed the trial court's

decision to allow the district attorney's office to prosecute the defendant on the other charges. (*Id.* at pp. 148–149.)

In *Millsap v. Superior Court* (1999) 70 Cal.App.4th 196 [82 Cal.Rptr.2d 733], the defendant, while charged with multiple felonies, including murder, allegedly solicited the separate murder of the two DDA's who were assigned to prosecute the case. After the two additional counts were added alleging the solicitation of murder of the two DDA's, the defendant moved to recuse the entire Office of the Los Angeles District Attorney. (*Id.* at pp. 198–199.) While the appellate court decided recusal of the two DDA's was necessary as to their prosecuting the new solicitation of murder charges, it found there was no conflict of interest requiring either their recusal or that of the entire office as to the remaining charges. The court noted there was no showing of widespread communication within the district attorney's office or extensive media coverage of defendant's solicitation of the murder of the two DDA's, and the DDA's did not witness any physical action by the defendant. The court further concluded, "Even if a conflict of interest were inferable from the facts of the case, there is no showing that [the defendant] would suffer actual prejudice merely because the Los Angeles District Attorney's office remains as prosecutor. We note that, in *Conner*, the court did not disturb the trial court's ruling that the office continue to prosecute the other charges in that case." (*Id.* at p. 203; see also *Trujillo v. Superior Court* (1983) 148 Cal.App.3d 368, 370–373 [196 Cal.Rptr. 4] [affirming denial of recusal of district attorney's office of 65 to 70 felony prosecutors after defendant assaulted a DDA and tried to strangle him with his own tie as the DDA prevented defendant from escaping from courtroom].)

### 3. *The Trial Court Erred in Ordering Recusal*

Turning to the record before us, there was no evidence that any conflict of interest existed or that any such conflict, if one existed, was so grave as to render it unlikely that Petrisca would receive fair treatment. The trial court never made such findings. In believing that it would be better if another agency prosecuted this case because any prosecutor from the DA's office would naturally "feel more pressure and [be] more uncomfortable than a prosecutor from another agency," the trial court failed to apply the correct legal standard required under section 1424. The prosecutor's degree of comfort or self-imposed pressure has no bearing on whether a conflict exists or whether a defendant will receive a fair trial. The goal of the trial judge is not to discover the prosecutorial agency that will be most "comfortable" handling any particular case or trial, but whether a conflict exists that is so grave that it is unlikely the defendant will receive a fair trial. As Falco himself suggested during his testimony, any prosecutor would feel pressure handling a case involving a death. By failing to apply the correct legal standard, the trial court abused its discretion.

The lack of evidence as to any conflict of interest is further demonstrated by the trial court's own separate finding that "the District Attorney's Office has handled the case appropriately to date" and that "all charging decisions that were made were handled in an appropriate fashion." Unlike the facts in *Conner*, no member of the DA's office was a direct victim or a percipient witness in this case, and there was no evidence that Falco was "inextricably involved in the case."

While it is undisputed that the victim was the mother of a DDA, there was no evidence that anyone from the DA's office acted inappropriately. The evidence showed that from the outset it was decided the case would be assigned to someone with no personal relationship with Jeffrey. Falco, who only had minimal professional contact with Jeffrey, had full discretion from the beginning to charge and prosecute the case as he saw fit. There is no evidence whatsoever that anyone, including Jeffrey, Falco's supervisors, or Jeffrey's brother Glenn, tried to influence Falco or interfere with his discretion. To the contrary, the evidence showed Falco's first contact with Jeffrey was *after* Petrisca had been charged, that Falco told Jeffrey he would be treated like any other family member who lost a loved one, and that Jeffrey deliberately kept his distance from the case so as to not interfere with it in any way. As to Glenn, there is no evidence he ever spoke with Falco or anyone connected with the DA's office or exerted any influence in the prosecution of the case. In short, because the evidence before the trial court established that no conflict of interest existed, the court erred in granting Petrisca's recusal motion.

In support of his contention that recusal was appropriate in this case, Petrisca argues there was no evidence to support the charges against him and that the charges demonstrate "vengeful motives." This argument not only ignores the legal standard for recusal under section 1424, but is contrary to the findings of the preliminary hearing magistrate who held him to answer for the charged offenses and denied his motion to dismiss, as well as the decision of the trial court that specifically found all charging decisions were handled appropriately. We see no reason based on this record to second-guess the trial court's findings on whether the charges were appropriate. In any event, recusal is not the appropriate remedy merely because Petrisca does not agree with the charges that were filed. If Petrisca wishes to challenge the charges, he may test the magistrate's holding order with an appropriate motion to dismiss under section 995.

Petrisca further contends the trial court's recusal ruling was supported by the "wide-spread interest" in the case within the DA's office, as exemplified by (1) Zajec's passing of information about the case to the appropriate people within the DA's office because of possible media interest, and (2) the fact

others within the DA's office asked Falco about the case. There is no support for this contention. According to Zajec's declaration, his involvement was limited to making sure the case was assigned to a disinterested DDA, getting information about the case from Wynn and Falco, and passing on information regarding the case to appropriate people in the DA's office "because of possible media interest." Just because Zajec prepared for any *possible* media interest does not mean there was widespread interest in the office, that information about the case was communicated outside of the DA's office, or that any of this created a conflict of interest requiring recusal. Likewise, Falco's testimony that some DDA's asked him about the case suggests a few individuals in his branch office knew about it. There was no evidence any of these individuals commented on how he was prosecuting the case or otherwise exerted any influence on Falco's handling of the case. As Falco himself testified, the "pressure" he felt was self-imposed.

■ Finally, Petrisca argues his right to fairness will be prejudiced by the DA prosecuting the case because Glenn "apparently speaking for both he and his brother has already threatened that he and [DDA] Jeff Semow intend to be vociferous at the sentencing hearing" in this case. There no evidence that Glenn spoke for Jeffrey on issues regarding the case, and it is unknown whether either brother will choose to address the trial court at sentencing. More importantly, a next-of-kin impact statement is not evidence presented by the prosecution, and the victim's family has the right to make such a statement regardless of the prosecutorial agency that handles the case. (See § 1191.1; see, also, *People v. Stringham* (1988) 206 Cal.App.3d 184, 196 [253 Cal.Rptr. 484] [clear purposes behind section 1191.1 are to acquaint court with victim's unique perspective of case and require consideration of victim's statement by the court].)

In sum, the trial court recused an entire agency of 948 prosecutors based on the individual, and understandable, self-imposed feelings of a single prosecutor.[2] Not only was the wrong legal standard applied, but there was no substantial evidence of a conflict of interest or that any conflict was so grave as to render it likely that Petrisca would be treated unfairly. Because the trial court abused its discretion, the recusal order must be reversed. (See *People v. Neely* (1999) 70 Cal.App.4th 767, 778–779, 792–793 [82 Cal.Rptr.2d 886] [reversing recusal order without remanding for reconsideration when trial court applied wrong legal standard].)

---

[2] We note that Falco is no longer the prosecutor in this case. The DA's office has reassigned the case to another DDA.

## DISPOSITION

For the above reasons, the trial court's order recusing the DA's office is reversed with directions to enter a new order denying Petrisca's recusal motion.

Cooper, P. J., and Boland, J., concurred.