Filed 3/30/21  P. v. Williams CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DENNIS MAURICE WILLIAMS,<br><br>Defendant and Appellant. | F078192<br><br>(Super. Ct. No. BF170086A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  David Minier* and Judith K. Dulcich, Judges.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Tracy Yao, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

*Retired Judge of the Madera Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

## INTRODUCTION

The Kern County District Attorney's Office charged various Penal Code violations against defendant Dennis Maurice Williams after defendant assaulted his wife on multiple occasions. (Undesignated statutory references are to the Penal Code.) After the last assault, defense counsel learned defendant's wife was friends with a deputy district attorney in the Kern County office. Defendant moved to disqualify the entire Kern County District Attorney's Office based on the alleged conflict of interest. He argued the deputy district attorney who was friends with his wife was a potential witness who had not been "walled off" from the case, so the entire office should be disqualified from prosecution of the case. The court denied defendant's disqualification motion.

In his sole issue on appeal, defendant argues the trial court erred in failing to recuse one of the assigned deputy district attorneys and the Kern County District Attorney's Office as a whole based on the alleged conflict of interest and the potential for prejudice. He contends he was treated unfairly as a result of the conflict of interest.

Finding no error, we affirm the judgment.

## FACTUAL BACKGROUND

L.W. testified regarding the events giving rise to the charges. She had been married to defendant for 15 years and lived with him until October 2017. L.W.'s adult daughter from a prior marriage, S.G., lived with L.W. from September to December 2017. According to L.W., her and defendant's marriage began to fall apart when she learned he was using methamphetamine; he was also drinking. Sometime thereafter, L.W. began having an affair.

Around the end of September or beginning of October 2017, defendant confronted L.W. about her affair when she returned from a trip. Defendant hit L.W. on her head; they struggled and ended up in the bedroom where defendant choked L.W., "trying to get the devil out." L.W. had light scratch marks and soreness all over after the incident.

2.

Then, in the beginning of October 2017, defendant approached L.W. in the kitchen, hit her on her head, and threw her up against the sink.

On October 19, 2017, L.W. woke up and went to the kitchen to make coffee. Defendant followed her, and they were arguing about the affair. During the argument, L.W. slammed the coffee pot on the counter and it broke, spilling coffee on the floor. Defendant then pulled off his leather belt and began to beat L.W. with the strap on her head and shoulders. L.W. was screaming for help and asking him to stop. S.G. came into the room and wedged herself between defendant and L.W. S.G. told defendant to stop and leave. L.W. had welts on her head as a result of the incident. L.W. did not call the police after the first three incidents out of fear and embarrassment and because she felt like she deserved the abuse.

On October 21, 2017, L.W. and defendant were arguing about her affair again. Defendant asked L.W. for specifics, and L.W. refused to provide them. Defendant told L.W. he was depressed and wanted to commit suicide. L.W. saw a shotgun propped against the wall in the hallway and became terrified. She grabbed it, ran towards the bedroom, and threw the gun under the bed. Defendant kicked in the bedroom door and "rushed" L.W., pushing her against the closet. He then reached to get the gun from underneath the bed and L.W. ran out of the house to her next-door neighbor's home. L.W. recalled defendant saying he was going to kill himself. L.W. asked her neighbor to call 911. The police arrested defendant that night and offered L.W. an emergency protective order, which she accepted. She reported the other three incidents of abuse to police at that time.

After that incident, L.W. considered her relationship with defendant over. She changed all the locks to the house and the gates. Felony charges were filed against defendant and Deputy District Attorney Christopher Puck was assigned to the case.

In the evening of November 20, 2017, L.W. was sitting on the couch watching television and talking on the phone. She heard a sound and then saw defendant at the

sliding glass door that led from the backyard to the house. The lock on that door did not work properly and the door could be maneuvered to bypass the lock. Defendant opened the door and charged at L.W. He said, "'Why are you trying to destroy me, bitch? You're going to die tonight.'" L.W. ran towards the front door and defendant caught her by her foot. As they struggled, defendant bit L.W.'s head and middle finger, resulting in a scar on her finger. He was on top of L.W. straddling her, holding her with his legs as he strangled her. L.W. bit defendant but she could not stop him because he overpowered her. Defendant pushed so hard on L.W.'s neck she could not scream or breathe. L.W. thought she was dying. Defendant's demeanor was "eerily calm." He choked L.W. until she passed out.

S.G. walked into the house and saw defendant with his hands around L.W.'s neck; L.W. was not moving. S.G. tried to hit defendant to knock sense into him; she told him to leave and that she was calling the police. S.G. called the police and defendant ran out.

L.W. recalled regaining consciousness, gasping for breath, and seeing and hearing her daughter. L.W.'s whole body was hurting; her hands, head, and neck were all "stinging." Her neck felt like it was "on fire" due to cuts from defendant's fingernails; L.W.'s head was stinging from defendant biting her, and her hand was bleeding from the other bite. She recalled hearing her daughter calling 911.

L.W. told the police what happened; she had trouble breathing and gasped for air every time she talked. The police photographed L.W.'s injuries and the prosecutor introduced those photographs at trial. The sliding door was left ajar. There was a billy club in the house, which L.W. identified at trial as one defendant kept in his car. The police recovered from the scene a Bluetooth earpiece and glasses belonging to defendant. At the request of the assigned deputy district attorney, Christopher Puck, the police collected DNA swabs from L.W.'s neck for DNA testing. L.W. refused medical treatment because she did not think she could afford it.

4.

That night, L.W. called some of her family and friends and her sorority sister, Felicia Nagle, a deputy district attorney. L.W. did not have the number of the assigned deputy district attorney, Christopher Puck, so she called Nagle to ensure the district attorney's office was informed of the situation immediately.[1]

Nagle recalled receiving a text from L.W. saying, "He tried to kill me." Nagle called back to determine who sent the text and L.W. answered sounding upset; Nagle then went to L.W.'s house. Nagle contacted Puck while at L.W.'s house to let him know she was there and that something had occurred. Puck asked Nagle to take a video with audio of the sound of L.W.'s voice. Nagle said she did not want to do it on her phone because she did not want to be involved in the case. Accordingly, Nagle's fiancé took a video of L.W., documenting her voice and the injuries to her neck. A few days later, L.W. texted Nagle pictures of her injuries, which Nagle forwarded to Puck.

At trial, Nagle denied she ever worked on this case as a prosecutor or that she weighed in on any of the procedures or how it was being handled. She testified Puck contacted her once and told her to provide emotional support to L.W. after L.W.'s home was burglarized and her dog's leg was broken.

As a result of the incidents, the Kern County District Attorney's Office charged defendant with corporal injury to a spouse (§ 273.5, subd. (a)) on or about October 19, 2017 (count 1) and on or about November 20, 2017 (count 6); assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)) between September 28, 2017, and October 7, 2017 (count 2); attempted murder (§§ 664, 187, subd. (a)) on or about November 20, 2017 (count 3); attempting to dissuade a witness (§ 136.1, subd. (c)(1)) on or about November 20, 2017 (count 4); burglary of an inhabited dwelling (§ 460, subd. (a)) on or about November 20, 2017 (count 5); and violation of a court protective order

---

[1]L.W. had seen Nagle representing the district attorney's office at a November 3, 2017, hearing against defendant. Nagle did not handle the hearing and moved for a continuance after she realized she knew the victim, L.W.

(§ 166, subd. (c)(1)) on or about November 20, 2017 (count 7). The information also alleged defendant personally used a deadly weapon (§ 12022, subd. (b)(1)) in count 1; he personally inflicted great bodily injury on the victim (§ 12022.7, subd. (e)) and committed the offenses while out on bail (§ 12022.1) in counts 3 through 6; he acted with premeditation and deliberation (§ 189) in count 3; and another person, other than an accomplice, was present in the residence during the commission of the burglary (§ 667.5, subd. (c)(21)) in count 5, making the offense a violent felony. The trial court subsequently granted defendant's section 995 motion to set aside the information as to count 7.

The jury found defendant not guilty of corporal injury to a spouse as alleged in count 1 but guilty of attempted infliction of injury on a spouse resulting in a traumatic condition (§§ 664, 273.5, subd. (a)); the jury also found true the deadly weapon enhancement to count 1. The jury found defendant not guilty of assault with great bodily injury as alleged in count 2 but found him guilty of the lesser included offense of simple assault (§ 240). On count 3, the jury found defendant guilty of attempted murder but did not find that it was premeditated. The jury found defendant guilty of count 4, intimidating a witness and/or victim by threat/force (§ 136.1, subd. (c)(1)), and count 6, inflicting injury on a spouse resulting in a traumatic condition (§ 273.5, subd. (a)). The jury also found true the on-bail and great bodily injury enhancements to counts 3, 4, and 6. The jury was unable to reach a verdict on count 5 (burglary), and the trial court subsequently dismissed that count.

The trial court sentenced defendant to an aggregate term of 14 years 10 months of imprisonment: the middle term of seven years on count 3, plus five years for the great bodily injury enhancement and two years for the on-bail enhancement and one-third the middle term of six months for count 1, plus an additional four months for the deadly weapon enhancement. The court also sentenced defendant to 180 days in county jail on

count 2, to be served concurrently with count 3. The court stayed defendant's sentences for counts 4 and 6 pursuant to section 654.

## DISCUSSION

### I. Relevant Procedural History

Before trial, defendant moved to recuse the Kern County District Attorney's Office, asserting the prosecution was overzealous for requesting DNA testing, overcharging the case, and making no offers despite defendant having no criminal record as a result of Deputy District Attorney Felicia Nagle's relationship with L.W. He further argued if Nagle testified, "Puck would be placed in an improper position of vouching for his close colleague DDA Nagle's credibility and perhaps his own."

The district attorney's office responded and attached declarations of both Nagle and Puck. Puck averred Nagle's input was never sought in determining the propriety of the charges or assessment of the case, and she had not advocated for how the case should be charged. Additionally, he explained other factors, rather than the alleged conflict of interest, motivated his strategic decisionmaking in the case. After defendant's final attack on L.W., which involved him strangling her, "the People attempted to initiate a discussion regarding a possible plea to a determinate term," which defense counsel rejected by stating he did not believe defendant would even take a misdemeanor. Accordingly, "the lack of plea … discussion [wa]s because the Defense refused to engage in any realistic discussion; not because of any decision by the People or Ms. Nagle." Puck had requested DNA testing in part because he "wanted an incontrovertibly independent source of corroboration" of L.W.'s allegations. Additionally, L.W. conveyed to Puck her preference that defendant receive the longest sentence possible because of her fear he would murder her if he was released. The district attorney's office argued disqualification was unsupported because there was no evidence Nagle was involved in a professional capacity in the case or that she advocated for any specific

7.

result or attempted to influence the prosecution of the case. The California Attorney General also filed an opposition to the motion for disqualification, reiterating and emphasizing the points raised in the district attorney's response.

At the hearing, defense counsel argued there was sufficient evidence to grant the motion or, alternatively, to permit an evidentiary hearing during which he could question Nagle. He asserted the cases relied upon by the district attorney's office and the Attorney General's office in their responses discussed 900-person prosecutorial offices in which the conflicted party had been walled off from the case, or an ethical wall had been put up to that particular person. Defense counsel argued, based on Puck's declaration, Nagle had not been walled off from the case nor was an ethical wall put in place. Rather, Puck admitted speaking to Nagle about the case and he encouraged her to provide emotional support to L.W. Defense counsel argued Puck and Nagle were in the same unit, had a social connection, and tried a death penalty case together, suggesting they were "close associates at work." Defense counsel argued the whole Kern County District Attorney's Office was "tainted" based on Nagle's association with L.W. and the fact Nagle could be a witness. He argued, an evidentiary hearing was merited because Nagle's declaration did not say "what communications she had with [L.W.] in response to [Puck's] text messages" and because Puck said he told Nagle about his impressions of the case.

Puck explained the Kern County District Attorney's Office has 85 to 90 attorneys, five branch locations, and a few hundred support staff. He agreed Nagle should not prosecute the case because she knows L.W. and it could result in an appearance of impropriety. However, he argued his relationship with Nagle was "purely professional" and he had only contacted her outside of work on two occasions. He asserted Nagle only saw L.W. once a year; they were not close friends or relatives. He noted there were no allegations either Nagle or he had violated any ethical duties or laws that would compromise defendant's right to due process or a fair trial. He further argued it was not a "no offer case" as defense counsel suggested; rather, he told the previous defense

8.

attorney they were willing to negotiate at the "pre-pre phase." Puck waited for the DNA results before communicating to the defense attorney his willingness to negotiate a determinative term; he stated if defendant was open to an offer, he was thinking "in the ballpark of 20 years." In response, defense counsel said, "'I don't even think my client would take a misdemeanor at this point'" and that he was "just going to get ready for trial." Based on the defense attorney's representation, Puck decided he was not going to waste his "time and effort to have a difficult discussion with the victim to find what's the lowest [sentence] she can live with." Defense counsel had not approached Puck since then to attempt to negotiate in good faith.

The court held it could not "find any justification … for recusing the entire District Attorney's office." With regard to Puck, the court further concluded it did not believe defendant had established a "prima facie showing for recusal that would require … or even suggest" an evidentiary hearing was needed. Rather, the only suggestions by defense counsel regarding why an evidentiary hearing was needed sounded "like a fishing hearing to try to get some more justification for the recusal," which was not a proper purpose of an evidentiary hearing. The court also held there was not a showing Puck could not be fair if he continued as the trial attorney. The court just suggested "he not talk to Ms. Nagle in any manner about the case." Accordingly, the court held "based on all of the above, … there's no reasonable likelihood of unfair treatment of the defendant by the District Attorney's office," and it denied the motion to recuse.

Deputy District Attorney Alexandra Ottoman tried the case. She moved in limine to bar any argument L.W. received special treatment or defendant received worse treatment as a result of L.W. knowing Nagle. The court held a related Evidence Code section 402 hearing during which L.W. and Nagle testified regarding their relationship. L.W. and Nagle knew each other through a sorority of which they were both members. Nagle was not very active and they saw each other a couple times a year. They had known each other for years. The last time L.W. saw Nagle was the night of the

November 20, 2017, incident. Nagle went to L.W.'s house. Nagle denied asking the police what they had done in the case or directing them to conduct any investigation while there. She recalled seeing a police officer speak to Puck while she was at the scene.

L.W. denied talking to Nagle about the case and denied receiving any special treatment from any office as a result of her relationship with Nagle. Nagle denied exercising any influence over how the case should be handled. Rather, she testified she tried to keep her distance from the case because she knew L.W. She recalled talking to Puck about getting him the photos she took, but she denied Puck ever told her his thoughts or impressions on the case. She also denied asking Puck what the offer was in the case. Puck at some point told Nagle about L.W.'s house being burglarized.

The court granted the prosecutor's motion in limine, noting it was not prohibiting either side from calling Nagle as a witness. The People called Nagle in their case-in-chief and defense counsel cross-examined her. The court later clarified its grant of the prosecution's motion in limine did not preclude defense counsel from attacking Nagle's credibility in argument as he could with any witness. And defense counsel could argue the elements of the crimes were not met, "whether it is because of bias or the facts themselves." In closing argument, defense counsel argued the investigation was improperly influenced by bias.

## II.    Standard of Review and Applicable Law

A motion to recuse the district attorney "may not be granted unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial." (§ 1424, subd. (a)(1).)  "'The statute "articulates a two-part test:  '(i) is there a conflict of interest?; and (ii) is the conflict so severe as to disqualify the district attorney from acting?'"'" (*People v. Bell* (2019) 7 Cal.5th 70, 97 (*Bell*); see *Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711 (*Haraguchi*).)  "A 'conflict'

10.

exists, under section 1424's first prong, whenever there is "'a reasonable possibility that the DA's office may not exercise its discretionary function in an evenhanded manner.'"" (*Bell*, *supra*, p. 97; see *People v. Eubanks* (1996) 14 Cal.4th 580, 592.) But recusal is not required unless, under the second prong, the possibility of unfair treatment "'is so great that it is more likely than not the defendant will be treated unfairly during some portion of the criminal proceedings.'" (*Bell*, at p. 97; see *Haraguchi*, *supra*, at p. 713.)

The trial court's decision on a motion to recuse the prosecutor is reviewed for abuse of discretion. (*Bell*, *supra*, 7 Cal.5th at p. 97; *Haraguchi*, *supra*, 43 Cal.4th at p. 711.) The trial court's factual findings are reviewed for substantial evidence, and its application of the law will be reversed only if arbitrary and capricious. (*Bell*, at p. 97; *Haraguchi*, at pp. 711–712; *People v. Vasquez* (2006) 39 Cal.4th 47, 56.)

## III.  Analysis

Defendant argues his convictions should be reversed and he should be given a new trial because the trial court erroneously denied his motion to disqualify Puck and the entire Kern County District Attorney's Office. He argues Puck had a conflict of interest that arose from his loyalty to and friendship with Nagle. He asserts Puck treated him differently because of L.W.'s friendship with Nagle in that there was no plea offer; Puck decided to collect DNA evidence only after speaking to Nagle; plea bargaining ended after Nagle's connection to L.W. was discovered; and the jury found the attempted murder was not premeditated, evidencing that the case was overcharged. Additionally, defendant argues Puck admitted he continued to communicate with Nagle regarding his thoughts and impressions on the case and he encouraged Nagle to reach out to L.W. after L.W's house was burglarized. Defendant further asserts the conflict of interest extended to the entire Kern County District Attorney's Office because there was no ethical screen between the conflicted attorneys—Puck and Nagle—and the case. He argues the motion in limine demonstrated the prosecutor who tried the case, Ottoman, "was not free of her

own bias and prejudice"; rather, "she had her own axe to grind because members of her office had been questioned." The People respond the court did not err in denying defendant's motion to recuse the entire district attorney's office because one deputy district attorney had a relationship with the victim. They contend Puck, who handled the case at the time of the recusal motion, did not have a conflict because he had no relationship with the victim outside of the case. Additionally, they argue substantial evidence supports the trial court's determination Nagle's conflict was not so grave as to require recusal of Puck or the entire Kern County District Attorney's Office. The People assert there was no evidence Puck was influenced by Nagle's connection to L.W. Nagle exercised no discretion in the case's prosecution and did not attempt to influence how the case was handled; Puck did not plan to call Nagle as a witness at the time of the recusal motion and he did not involve her in discussions regarding what charges would be filed, show her police reports, or review the evidence or discuss the merits of the case with her. They further argue there was no evidence to support defendant's claim Puck's actions in collecting DNA evidence, communicating with Nagle about the case, allegedly refusing to plea bargain, or expressing animosity toward defense counsel were motivated by bias or evidenced unfair treatment. They also assert Ottoman's challenged actions were not before the court when it decided the recusal motion and, regardless, they did not demonstrate unfair treatment or undue influence as a result of Nagle's conflict. Finally, the People assert, even assuming error, defendant's claim of prejudice was forfeited and, irrespective, defendant was not prejudiced—Ottoman did not improperly vouch for Nagle during closing arguments and there was no reasonable probability her remarks changed the outcome of the trial in light of the evidence supporting the convictions. There was also no evidence a plea bargain would have been struck; and defendant did not establish Ottoman's opposition to his motions to reduce sentence on count 1 influenced the court's decision to deny them.

12.

We conclude the trial court did not abuse its discretion in denying the motion to recuse; that is, there is substantial evidence to support the court's conclusion defendant failed to establish the possibility of unfair treatment by the Kern County District Attorney's Office, including by Deputy District Attorney Puck, was "'so great that it [was] more likely than not [he would] be treated unfairly during some portion of the criminal proceedings.'" (*Bell*, *supra*, 7 Cal.5th at p. 97; see *Haraguchi*, *supra*, 43 Cal.4th at p. 713.)

Here, the parties do not dispute Nagle had a conflict of interest based on her connection to L.W. However, defendant's allegation Nagle's connection created a reasonable likelihood defendant was or would be treated unfairly by Puck and the Kern County District Attorney's Office was unsupported by the evidence.

"'[A] motion to disqualify a prosecutor must be based upon a likelihood of unfairness and not upon mere speculation.'" (*Spaccia v. Superior Court* (2012) 209 Cal.App.4th 93, 107–108; see *Haraguchi*, *supra*, 43 Cal.4th at p. 719 [reiterating it is "an *actual likelihood of unfair treatment*, not a subjective perception of impropriety" that can warrant the significant step of recusal].)

Here, defendant's contention he was treated or would be treated unfairly by Deputy District Attorney Puck because of Puck's relationship with Nagle was not supported by the record. Puck explained the tactical reasons behind each of his decisions defendant argues was a result of the alleged conflict of interest. With regard to his strategy in plea negotiations, Puck detailed that on November 2, 2017, at a prepreliminary hearing, he offered defendant a plea to section 273.5, subdivision (a), a felony, with credit for time served and probation. Defendant rejected the offer and confirmed the matter for preliminary hearing. According to Puck, defendant's "egregious" acts on

13.

November 20, 2017, "dramatically changed the disposition of this case."[2] After that, Puck approached the defense attorney again about plea negotiations, but did not revisit the issue because a bargain did not seem possible in light of defense counsel's representation defendant would not plead to anything above a misdemeanor. Puck explained the severity of the events giving rise to the charges, particularly defendant's violation of the restraining order and attack on L.W. on November 20, 2017, impacted his decisionmaking with regard to plea bargaining. He explained he sought DNA evidence following the November 20, 2017, incident due to the severity of the charges and that they could result in a life sentence. He also wanted an independent source of corroboration of L.W's allegations. Puck averred Nagle "was not involved in **_any_** way" in his request for DNA testing of the swabs obtained at the scene on November 20, 2017.

There was no evidence Nagle influenced or was behind Puck's decisionmaking. Defendant's contention to the contrary is based entirely on speculation. Nagle's mere presence at the scene after the November 20, 2017, incident and her work relationship with Puck were insufficient to establish there was a reasonable likelihood Puck would treat defendant unfairly. This conclusion is further grounded by Puck's and Nagle's repeated attestations that Nagle was not involved in the charging or strategic decisionmaking related to the case. Accordingly, we cannot conclude the court abused its discretion in concluding defendant had not made a prima facie showing for recusal or to suggest an evidentiary hearing on the subject was required. (See *People v. Breaux* (1991) 1 Cal.4th 281, 294–295 [affirming denial of recusal motion where prosecutor's wife and victim were acquaintances and part of same social club but prosecutor had no relationship to victim or personal interest in case and evidence failed to show any connection which

---

[2]Puck averred in his five years as a Kern County prosecutor, this was the first time a victim/witness was so "brutally attacked—nearly murdered" while the defendant had a pending case involving the same victim. Puck further declared, "In the 50–100 strangulation cases [he had] personally reviewed or prosecuted as a prosecutor, this case has some of the most distinct injuries to a neck that [he had] seen, and thus is treated as an extremely aggravated case."

justified an inference of bias by the office or prosecutor]; see also *People v. Melcher* (2017) 10 Cal.App.5th 160, 163, 170 [mere fact victim and district attorney are married does not establish disabling conflict where there is no evidence the district attorney has influenced the prosecution, an ethical wall prevents the district attorney from influencing the case, and the district attorney waives any rights to participate in the case as a victim or a member of the victim's family].) We also do not find persuasive defendant's assertion recusal was justified because no formal ethical wall was created between Nagle and the case. Again, here, there is no evidence Nagle was involved in the case or that she influenced its prosecution—the purpose of an ethical wall. Nor can we conclude it was improper for Puck to tell Nagle about the subsequent burglary of L.W.'s house such that recusal was merited. (See *People v. Petrisca* (2006) 138 Cal.App.4th 189, 197–198 [recusal not required where prosecutor notified victim's son, fellow deputy district attorney, "he would be treated like any other family member who had lost a loved one, and that he would keep him updated on the status of the case"].)

We also cannot conclude the court erred in refusing to disqualify the entire Kern County District Attorney's Office. "Recusal of an entire district attorney's office is an extreme step." (*People v. Cannedy* (2009) 176 Cal.App.4th 1474, 1481; see *People v. Petrisca*, *supra*, 138 Cal.App.4th at p. 195.) Thus, "'[d]isqualification of an entire prosecutorial office from a case is disfavored by the courts, absent a substantial reason related to the proper administration of justice.'" (*People v. Petrisca*, *supra*, at p. 195; see *People v. Hernandez* (1991) 235 Cal.App.3d 674, 679–680.) The showing of a conflict of interest necessary to justify so drastic a remedy must be especially persuasive. (*People v. Petrisca*, at p. 195; *People v. Hernandez*, *supra*, at p. 678.)

The court did not abuse its discretion in concluding there was insufficient evidence to establish defendant was more likely than not going to be treated unfairly by the entire Kern County District Attorney's Office based upon Nagle's attenuated relationship to L.W. Indeed, there was no evidence other members of the district attorney's office, other

than Puck and Ottoman, even knew about Nagle's limited association with L.W. (Compare *People v. Conner* (1983) 34 Cal.3d 141, 148–149 [affirming recusal of entire 25-person district attorney's office where deputy district attorney was victim of "harrowing" assault, circumstances were "dramatic and gripping," and communications about incident were "pervasive" within office], with *Trujillo v. Superior Court* (1983) 148 Cal.App.3d 368, 370, 373 [affirming denial of recusal motion where deputy district attorney was victim of charged assault with a deadly weapon but district attorney's office was large, containing 65 to 70 felony prosecutors, and communication about event was minimal].)  Rather, there was no evidence to support defendant's contention that Nagle's alleged conflict of interest was so significant that it justified the "dramatic remedy" of recusal of the entire Kern County District Attorney's Office.  (See *People v. Hernandez*, *supra*, 235 Cal.App.3d at p. 680 [concluding trial court erred in recusing entire district attorney's office where there was no evidence information or impressions obtained by conflicted attorneys would permeate entire office, only speculation; "sheer speculation does not constitute sufficient evidence of potential bias to recuse an entire prosecutorial office from a case"].)  Accordingly, the court did not err in concluding there was no justification for recusing the entire district attorney's office.  (See *People v. Snow* (2003) 30 Cal.4th 43, 86 [trial court properly refused to recuse district attorney's office without showing by defendant that prosecution by office would render fair treatment unlikely]; *People v. Petrisca*, *supra*, 138 Cal.App.4th at pp. 197–198 [reversing order recusing entire district attorney's office where deceased victim's son was a deputy district attorney in that office but he did not interfere in prosecution of case and prosecutor never altered his course of action based on contact with victim's son; no evidence anyone in district attorney's office acted inappropriately].)

To the extent defendant argues his motion should have been granted in light of Ottoman's subsequent actions, we agree with the People that the court was required to decide the motion to recuse based on the evidence before it at the time the motion was

16.

made. Furthermore, defendant's argument Ottoman's motion in limine evidenced her bias which, he contends, arose from Nagle's limited association with L.W. is tenuous and unsupported. Rather, there was no evidence Nagle influenced Ottoman's tactical decisions in the case.[3] Accordingly, because the record before us supports the trial court's conclusion recusal of the Kern County District Attorney's Office was not justified, we find no abuse of discretion.

## DISPOSITION

The judgment is affirmed.

PEÑA, J

WE CONCUR:

POOCHIGIAN, ACTING P.J.

DETJEN, J.

---

[3]We further note recusal was not required simply because Nagle appeared as a witness at trial. (See *People v. Snow*, *supra*, 30 Cal.4th at pp. 86–87 [recusal was not required although two deputy district attorneys testified at trial]; *People v. Merritt* (1993) 19 Cal.App.4th 1573, 1580 ["merely because an employee may be a potential witness and credibility of that witness may have to be argued by the prosecuting attorney, there is no sufficient basis for that reason alone to recuse an entire prosecutorial office"]; accord, *People ex rel. Younger v. Superior Court* (1978) 86 Cal.App.3d 180, 210–211 [where one deputy district attorney may be called as witness on behalf of prosecution at trial, recusal of entire prosecutorial office is not reasonably required to ensure integrity of factfinding process, fairness or appearance of fairness at trial, orderly or efficient administration of justice or public trust, and confidence in criminal justice system].)

17.